COPY

FILED
2008 DEC 31 PM 1:37
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
BY:

Christopher B. Hockett (Cal. Bar No. 121539)
chris.hockett@dpw.com
DAVIS POLK & WARDWELL
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Facsimile: (650) 752-2111

*Attorneys for Defendants Morgan Stanley, Morgan Stanley & Co. Incorporated, Morgan Stanley Mortgage Capital Inc., Morgan Stanley Capital I Inc., Anthony B. Tufariello, William J. Forsell, Valerie H. Kay, and Steven S. Stern*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>- against -<br><br>MORGAN STANLEY, MORGAN STANLEY MORTGAGE CAPITAL INC., MORGAN STANLEY DEAN WITTER CAPITAL I INC., f/k/a MORGAN STANLEY CAPITAL I INC., MORGAN STANLEY & CO. INCORPORATED, MCGRAW-HILL COMPANIES, MOODY'S CORP., ANTHONY B. TUFARIELLO, WILLIAM J. FORSELL, VALERIE H. KAY, STEVEN S. STERN, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-4SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-5AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-5ARW, MORGAN STANLEY MORTGAGE LOAN | Civil Action No. **SACV08-01469 DOC (FMOx)**<br><br>**NOTICE OF REMOVAL OF ACTION UNDER <u>28 U.S.C. § 1452</u>**<br><br>**BY FAX** |

TRUST 2006-6AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-7, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-8AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-9AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-10SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-11, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-12XS, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-13AX, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-14SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-15XS, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-16AX,

Defendants.

------------------------------ x

PLEASE TAKE NOTICE that, on this date, defendants Morgan Stanley, Morgan Stanley & Co. Incorporated, Morgan Stanley Mortgage Capital Inc., Morgan Stanley Capital I Inc. (sued incorrectly here as “Morgan Stanley Dean Witter Capital I Inc.”), Anthony B. Tufariello, William J. Forsell, Valerie H. Kay, and Steven S. Stern (“Morgan Stanley Defendants”), by their undersigned counsel, file this Notice of Removal pursuant to 28 U.S.C. § 1452, and remove to this Court the action known as *Public Employees' Retirement System of Mississippi v. Morgan Stanley, et al.*, Case No. 30-2008-00226005, previously filed in the Superior Court for the State of California, County of Orange. The grounds for removal are set forth below.

## SUMMARY

1. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1334 because this matter is related to a pending title 11 bankruptcy case.

2. Removal is proper under 28 U.S.C. § 1452 because section 1452 controls over the non-removal provisions of Section 22(a) of the Securities Act of 1933. *Carpenters Pension Trust for S. Cal. v. Ebbers*, 299 B.R. 610 (C.D. Cal. 2003). In other words, defendants are entitled to have this case heard in a federal forum rather than state court because it is related to a federal bankruptcy proceeding.

3. Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi PERS" or "Plaintiff") filed a Summons and Complaint in the above-titled action in the Superior Court for the State of California, County of Orange, on December 2, 2008. Plaintiff served a copy of the Complaint and a Summons directed to Morgan Stanley & Co. Incorporated ("MSCo") on MSCo's designated agent for service of process in Los Angeles, California, on December 5, 2008. A copy of the Summons and Complaint is attached hereto as Exhibit A. The other Morgan Stanley Defendants have not yet been served with the Summons and Complaint. On information and belief, Defendant McGraw-Hill Companies was served with the Summons and Complaint on December 5, 2008. On information and belief, Defendant Moody's Corp. was served with the Summons and Complaint on December 11, 2008. On information and belief, Defendants Morgan Stanley Mortgage Loan Trusts 2006-4SL, 2006-5AR, 2006-5ARW, 2006-6AR, 2006-7, 2006-8AR, 2006-9AR, 2006-10SL, 2006-11, 2006-12XS, 2006-13AX, 2006-14SL, 2006-15XS, and 2006-16AX (the "Issuing Trusts Defendants") have not yet been served with the Summons and Complaint.

4. On information and belief, Defendants McGraw-Hill Companies and Moody's Corp. join in this Notice of Removal and will file Joinders in Notice of Removal to that effect with this Court.

5. Accordingly, all defendants that have been served with the Summons and Complaint have joined in this Notice of Removal.

## PROCEDURAL BACKGROUND

6. MSCo's time to answer the Summons and Complaint has not expired and it has not yet served or filed an answer.

7. No further proceedings have occurred in the above-titled action in the Superior Court for the State of California.

8. This Notice of Removal is timely under 28 U.S.C. § 1446(b) and Fed. R. Bankr. P. 9027(a)(3) because it is being filed within thirty days after receipt of the Summons and Complaint.

## DISCUSSION

9. Removal is proper under 28 U.S.C. § 1452, which provides for "Removal of claims related to bankruptcy cases." In particular, section 1452(a) provides that "[a] party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under § 1334 of this title." Under 28 U.S.C. § 1334(b), this Court has jurisdiction to hear all civil proceedings that are "related to cases under title 11," which is the Bankruptcy Code. This action is "related to [a] case[] under title 11," as explained below.

10. This action asserts claims under the Federal securities laws, specifically sections 11, 12 and 15 of the Securities Act of 1933. Compl. ¶¶ 1, 4. Plaintiff sues

on behalf of a purported class of purchasers of mortgage pass-through certificates, which are alleged to be "securities entitling the holder to income payments from pools of mortgage loans and/or mortgage-backed securities ('MBS')." Compl. ¶ 2.

11. Plaintiff asserts that defendants in this matter sold those certificates through a Registration Statement, Prospectus and Prospectus Supplements ("Offering Documents") that allegedly contained material misstatements and omissions of material fact concerning, among other things, the mortgage pools underlying the certificates. Compl. ¶¶ 3, 4.

12. The Complaint alleges that the certificates that are the subject of the action were issued by fourteen Issuing Trusts, each of which is a defendant in the action. Compl. ¶¶ 7, 23.

13. The Complaint alleges that certificates sold pursuant to materially false and misleading offering documents were issued by, among others, Morgan Stanley Mortgage Loan Trusts 2006-11 and 2006-15XS. Compl. ¶ 23. The Complaint further alleges that the Prospectus Supplements for the certificates issued by these particular trusts list American Home Mortgage Corp. ("AHM") as a loan originator accounting for more than ten percent of the respective loans in the mortgage pools underlying those trusts. Compl. ¶ 110. The Complaint purports to quote sections of the Prospectus Supplements for these trusts that contain "representations regarding the underwriting standards utilized by" AHM, *id.* at ¶¶ 108, 110, and goes on to allege that these quoted representations were materially false and misleading when made, *id.* at ¶ 114.

14. AHM and AHM affiliates (collectively the "AHM Debtors") are currently in Chapter 11 bankruptcy proceedings (Case No. 07-11047-CSS) ("the

Bankruptcy Proceedings") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

15. A case is "related to" a bankruptcy proceeding within the meaning of 28 U.S.C. § 1334(b) when "the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Carpenters*, 299 B.R. at 613 (*citing In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988) (internal quotations omitted)). In the Ninth Circuit, a defendant's claim for contractual indemnity or contribution against an entity in bankruptcy gives rise to "related to" jurisdiction. *Id.* (*citing In re Enron Corp.*, 2003 WL 21637908 (C.D. Cal. 2003); *Sizzler USA Restaurants, Inc. v. Belair & Evans LLP (In re Sizzler Restaurants Int'l, Inc.)* 262 B.R. 811, 818-19 (Bankr. C.D. Cal. 2001)).

16. The Plaintiff's claims are related to the ongoing Bankruptcy Proceedings because this suit could have a direct and material impact on the outcome of those proceedings. Specifically, Morgan Stanley Mortgage Capital Holdings LLC (successor-in-interest by merger to defendant Morgan Stanley Mortgage Capital Inc.) ("MSMCH") has filed Proofs of Claim against the AHM Debtors in the Bankruptcy Proceedings. MSMCH asserts, among other claims, "a contingent, unliquidated Claim for any such indemnifiable amounts relating to a breach of a representation, warranty or covenant made in the Agreements that may be discovered by [MSMCH] subsequent to the date [of the Proof of Claim]." *See* Proof of Claim, filed January 11, 2008, attached hereto as Exhibit B.

17. Pursuant to the "Agreements" referenced in the Proof of Claim[1], AHM has agreed to indemnify MSMCH and its affiliates, present and former directors, officers, employees and agents for any claims—such as the ones made in this case—that arise out of or are based upon any alleged untrue statement of a material fact contained in the Prospectus Supplements and other Offering Documents. *See* Exhibit B to the Agreement, relevant excerpts of which are attached hereto as Exhibit C ("[AHM] agrees to indemnify and hold harmless . . . [MSMCH] . . . and [MSMCH's] affiliates and . . . present and former directors, officers, employees and agents . . . against any and all losses, claims, damages or liabilities, joint or several, to which they or any of them may become subject under the 1933 Act . . . insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based in whole or in part upon any untrue statement or alleged untrue statement of a material fact contained in the Prospectus Supplement, the Offering Circular . . . or in the Free Writing Prospectus or any omission or alleged omission to state [therein] . . . a material fact required to be stated therein or necessary to make the statements therein . . . not misleading . . . .").

18. Thus, this action necessarily affects the Morgan Stanley Defendants' indemnity claim against AHM. The outcome of this litigation may determine the amount of any distribution from the AHM Debtors' bankruptcy estate to the Morgan Stanley Defendants on any claim for indemnity or contribution. That, in turn, would affect the amount of property available for distribution to other creditors.

[1] Specifically, the Third Amended and Restated Mortgage Loan Purchase and Warranties Agreement between AHM and Morgan Stanley Mortgage Capital.

19. Accordingly, this action is "related to" the Bankruptcy Proceedings, and removal is proper under 28 U.S.C. § 1452(a).

20. Furthermore, removal is proper under 28 U.S.C. § 1452(a) despite the non-removal provisions of Section 22(a) of the Securities Act of 1933. As this Court has held, the bankruptcy removal statute trumps the Securities Act's prohibition on removal. *See Carpenters*, 299 B.R. at 614 (*citing In re Global Crossing Ltd. Sec. Litig.*, 2003 U.S. Dist. LEXIS 11958 at *3 (S.D.N.Y. July 15, 2003)).

21. Promptly upon filing of this Notice of Removal, a true copy of this Notice of Removal will be provided to all adverse parties pursuant to 28 U.S.C. § 1446(d) and Fed. R. Bankr. P. 9027(b).

22. Concurrently with the filing of this Notice of Removal, the Morgan Stanley Defendants are filing a Notification of Filing of Notice of Removal with the Clerk of the Superior Court for the State of California in accordance with the terms of 28 U.S.C. § 1446(d).

23. As required under Fed. R. Bankr. P. 9027(a)(1), the Morgan Stanley Defendants state that the claims asserted against them are non-core, within the meaning of 28 U.S.C. § 157(b), and that they do not consent to entry of final orders or judgment by the bankruptcy judge.

WHEREFORE, the Morgan Stanley Defendants remove this action from the Superior Court for the State of California.

Dated: December 30, 2008

DAVIS POLK & WARDWELL

By: [signature]
Christopher Hockett
(Cal. Bar No. 121539)

1600 El Camino Real
Menlo Park, California 94025
Tel: (650) 752-2000
Fax: (650) 752-2111
chris.hockett@dpw.com

*Attorneys for Defendants Morgan Stanley, Morgan Stanley & Co., Incorporated, Morgan Stanley Mortgage Capital, Inc., Morgan Stanley Capital I Inc., Anthony B. Tufariello, William J. Forsell, Valerie H. Kay, and Steven S. Stern*

# EXHIBIT A

CT Corporation

**Service of Process Transmittal**
12/08/2008
CT Log Number 514171026

**TO:** Alita Wingfield, Managing Attorney
Morgan Stanley Law Division
1221 Avenue of the Americas, 35th Floor
New York, NY 10020

**RE:** **Process Served in California**

**FOR:** Morgan Stanley & Co. Incorporated (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Public Employees' Retirement System of Mississippi, Individually and On Behalf of All Others Similarly Situated, Pltf. vs. Morgan Stanley, et al. including Morgan Stanley & Co., Incorporated, Dfts. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Summons, Class Action Complaint, Attachment(s) |
| **COURT/AGENCY:** | Orange County, Superior Court, CA<br>Case # 30200800226005 |
| **NATURE OF ACTION:** | Violation of Section 11 of the Securities Act - Failed to disclose the true risk of investing in the Certificates |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 12/05/2008 at 11:30 |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | David R. Stickney<br>Bernstein Litowitz Berger & Grossmann LLP<br>12481 High Bluff Drive<br>Suite 300<br>San Diego, CA 92130-3582<br>858-793-0070 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 12/08/2008, Expected Purge Date: 01/07/2009<br>Image SOP<br>Email Notification, Barbara Valente Barbara.Valente@morganstanley.com<br>Email Notification, Mel Klusky mel.klusky@morganstanley.com<br>Email Notification, Damian MacDonald Damian.MacDonald@morganstanley.com<br>Email Notification, Crystal Pruden crystal.pruden@morganstanley.com<br>Email Notification, Christopher M Wilson Christopher.M.Wilson@morganstanley.com<br>Email Notification, Alita Wingfield Alita.Wingfield@morganstanley.com<br>Email Notification, Lenise Davis lenise.davis@morganstanley.com<br>Email Notification, Osmond Fortin Osmond.Fortin@morganstanley.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Nancy Flores |
| **ADDRESS:** | 818 West Seventh Street<br>Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

Page 1 of 1 / MS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

12/05/08 @ 11:30

# SUMMONS
## (CITACION JUDICIAL)

SUM-100

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

DEC 02 2008

ALAN CARLSON, Clerk of the Court

BY J. HAINES DEPUTY

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***

MORGAN STANLEY, MORGAN STANLEY MORTGAGE CAPITAL INC., MORGAN STANLEY DEAN WITTER CAPITAL I INC., f/k/a MORGAN STANLEY CAPITAL I INC., MORGAN STANLEY & CO., INCORPORATED, McGRAW-HILL COMPANIES, MOODY'S CORP., ANTHONY B. TUFARIELLO, WILLIAM J. FORSELL, VALERIE H. KAY, STEVEN S. STERN, [Additional Parties Attachment form is attached]

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***

PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, Individually and On Behalf of All Others Similarly Situated,

**You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.**

**There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.**

***Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.***

***Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.***

30-2008

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court for the State of California, County of Orange
Complex Civil Center
751 W. Santa Ana Blvd.
Santa Ana 92701

CASE NUMBER: *(Número del Caso):* 00226005

JUDGE GAIL A. ANDLER
DEPT. CX102

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
David R. Stickney (Bar No. 188574) Tel: 858-793-0070 Fax: 858-793-0323
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
12481 High Bluff Drive, Suite 300
San Diego, CA 92130-3582

DATE: *(Fecha)* DEC 02 2008 Clerk, by *(Secretario)* J. HAINES, Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*: **MORGAN STANLEY & CO., INCORPORATED**

under: ☒ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*: 12/05/08

Page 1 of 1

SUM-200(A)

| SHORT TITLE: PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI v. MORGAN STANLEY, et al. | CASE NUMBER: |
|---|---|

**INSTRUCTIONS FOR USE**

- This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
- If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff ☒ Defendant ☐ Cross-Complainant ☐ Cross-Defendant

MORGAN STANLEY MORTGAGE LOAN TRUST 2006-4SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-5AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-5ARW, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-6AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-7, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-8AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-9AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-10SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-11, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-12XS, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-13AX, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-14SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-15XS, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-16AX



Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

Legal Solutions Plus

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| David R. Stickney (Bar No. 188574)<br>BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP<br>12481 High Bluff Drive, Suite 300<br>San Diego, CA 92130-3582<br>TELEPHONE NO.: 858-793-0070 FAX NO.: 858-793-0323<br>ATTORNEY FOR (Name): Public Employees' Retirement System of Mississippi | FILED<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ORANGE<br>CENTRAL JUSTICE CENTER<br>DEC 02 2008<br>ALAN CARLSON, Clerk of the Court<br>BY J. BAIN 30-2008 |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange<br>STREET ADDRESS: 751 W. Santa Ana Blvd.<br>MAILING ADDRESS: P.O. Box 838<br>CITY AND ZIP CODE: Santa Ana 92701<br>BRANCH NAME: Complex Civil Center | |
| CASE NAME: Public Employees' Retirement System of Mississippi v. Morgan Stanley, et al. | |

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 00226005 |
|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: JUDGE GAIL A. ANDLER<br>DEPT: DEPT. CX102 |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [X] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [X] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [X] Substantial amount of documentary evidence
   d. [X] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. [X] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify)*: Three (under Securities Act of 1933)
5. This case [X] is [ ] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: December 2, 2008

David R. Stickney (Bar No. 188574) — (TYPE OR PRINT NAME)

[signature] (by JMD) — (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.



Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Legal Solutions Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
DAVID R. STICKNEY (Bar No. 188574)
TIMOTHY A. DeLANGE (Bar No. 190768)
BRETT M. MIDDLETON (Bar No. 199427)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323
davids@blbglaw.com
timothyd@blbglaw.com
brettm@blbglaw.com

*Attorneys for Plaintiff Public Employees' Retirement System of Mississippi*

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

DEC 02 2008

ALAN CARLSON, Clerk of the Court

BY J. GAINES DEPUTY

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

COUNTY OF ORANGE

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MORGAN STANLEY, MORGAN STANLEY MORTGAGE CAPITAL INC., MORGAN STANLEY DEAN WITTER CAPITAL I INC., f/k/a MORGAN STANLEY CAPITAL I INC., MORGAN STANLEY & CO., INCORPORATED, MCGRAW-HILL COMPANIES, MOODY'S CORP., ANTHONY B. TUFARIELLO, WILLIAM J. FORSELL, VALERIE H. KAY, STEVEN S. STERN, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-4SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-5AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-5ARW, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-6AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-7, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-8AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-9AR, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-10SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-11,<br><br>(Caption continued on next page) | Case No. 30-2008 00226005<br><br>Judge: JUDGE GAIL A. ANDLER DEPT. CX102<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

THIS CASE IS SUBJECT TO MANDATORY ELECTRONIC FILING PURSUANT TO RULE 308 OF THE LOCAL RULES OF THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

MORGAN STANLEY MORTGAGE LOAN TRUST 2006-12XS, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-13AX, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-14SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-15XS, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-16AX,

Defendants.

# TABLE OF CONTENTS

Page


I. SUMMARY OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. THE PARTIES ..... 6

A. Plaintiff ..... 6

B. Defendants ..... 6

IV. FACTUAL BACKGROUND ..... 10

A. The Development Of The Secondary Mortgage Market And Subprime Mortgages ..... 10

B. The Mechanics Of Structuring Mortgage Pass-Through Certificates ..... 13

C. Assessing The Quality Of A Mortgage Pass-Through Certificate Investment ..... 14

D. The Role Of The Ratings Agencies In Structuring And Rating Certificates ..... 16

V. CERTIFICATES OFFERED BY DEFENDANTS ..... 17

VI. DEFENDANTS MISREPRESENTED THE NATURE OF THE LOANS UNDERLYING THE CERTIFICATES ..... 19

A. Representations Regarding Loan Origination Underwriting ..... 19

B. Representations Regarding Appraisals ..... 21

C. Representations Regarding Credit Enhancement ..... 22

D. Defendants' Representations Failed To Disclose The True Risk Of Investing In The Certificates ..... 24

1. The Deterioration Of Underwriting Standards ..... 24

2. Inadequate Due Diligence Of Underwriting Standards ..... 26

3. The Investment-Grade Ratings Misrepresented The True Risk Of The Certificates ..... 27

VII. MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS ..... 28

VIII. CLASS ACTION ALLEGATIONS ..... 37

FIRST CAUSE OF ACTION
For Violation of Section 11 of the Securities Act (Against The Individual Defendants, Issuing Defendants and Underwriter Defendants) .......... 39

SECOND CAUSE OF ACTION
For Violation of Section 12(a)(2) of the Securities Act (Against the Issuing Defendants and Underwriter Defendants) .......... 41

THIRD CAUSE OF ACTION
For Violation of Section 15 of the Securities Act (Against Morgan Stanley, MSMC and MSCo) .......... 42

RELIEF REQUESTED .......... 42

## I. SUMMARY OF THE ACTION

1. Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi PERS" or "Plaintiff") brings this securities class action on behalf of itself and all persons or entities ("plaintiffs" or the "Class") who purchased or otherwise acquired beneficial interests in the assets of the Morgan Stanley Issuing Trusts (defined, *infra*) pursuant to or traceable to Morgan Stanley Dean Witter Capital I Inc., f/k/a Morgan Stanley Capital I Inc.'s ("MSC I") March 14, 2006 Registration Statement and accompanying prospectuses and prospectus supplements. By this action, Mississippi PERS seeks redress pursuant to the Securities Act of 1933 (the "Securities Act") against defendants Morgan Stanley, MSC I, Morgan Stanley Mortgage Capital Inc. ("MSMC"), Morgan Stanley & Co., Incorporated ("MSCo"), McGraw-Hill Companies, Moody's Corp., Anthony B. Tufariello, William J. Forsell, Valerie H. Kay, Steven S. Stern, and the Issuing Trusts.[1]

2. This action arises from defendants' sale of mortgage pass-through certificates using false and misleading offering documents. Mortgage pass-through certificates are securities entitling the holder to income payments from pools of mortgage loans and/or mortgage-backed securities ("MBS"). Here, the loan pools consisted of loans for residential property predominately in California. Fundamentally, the value for pass-through certificates depends on the ability of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event of default. In this regard, rating agencies played an important role in the sale of such securities to investors. Credit rating agencies were supposed to evaluate and report on the risk associated with investment alternatives. Based on the rating agencies' purported analysis of the loan pools, the certificates received high ratings, including "triple-A," categorizing them as investment-grade securities. As

---

[1] The Issuing Trusts, as set forth in ¶23, *infra*, include defendants: Morgan Stanley Mortgage Loan Trust 2006-4SL, Morgan Stanley Mortgage Loan Trust 2006-5AR, Morgan Stanley Mortgage Loan Trust 2006-5ARW, Morgan Stanley Mortgage Loan Trust 2006-6AR, Morgan Stanley Mortgage Loan Trust 2006-7, Morgan Stanley Mortgage Loan Trust 2006-8AR, Morgan Stanley Mortgage Loan Trust 2006-9AR, Morgan Stanley Mortgage Loan Trust 2006-10SL, Morgan Stanley Mortgage Loan Trust 2006-11, Morgan Stanley Mortgage Loan Trust 2006-12XS, Morgan Stanley Mortgage Loan Trust 2006-13AX, Morgan Stanley Mortgage Loan Trust 2006-14SL, Morgan Stanley Mortgage Loan Trust 2006-15XS, Morgan Stanley Mortgage Loan Trust 2006-16AX.

alleged below, however, defendants misrepresented the quality of the loans in the loan pools and gave unjustifiably high ratings to the certificates.

3. On March 14, 2006, MSC I filed with the Securities and Exchange Commission ("SEC") the Pre-effective Amendment No. 2 to Form S-3 Registration Statement under the Securities Act of 1933 (the "Registration Statement"), whereby it indicated its intention to sell more than 29 billion of the originally registered 50 billion mortgage pass-through certificates ("Certificates") through a yet-to-be-determined number of individual entities created solely to issue the Certificates (the "Issuing Trusts"). The Certificates were to be issued pursuant to the Registration Statement and an accompanying prospectus, also filed with the SEC on March 14, 2006 (the "Prospectus"), generally explaining the structure of the Issuing Trusts and an overview of the Certificates. The Certificates were then sold to investors by the Underwriter Defendants, as defined herein, pursuant to a series of prospectus supplements, which were also filed with the SEC and incorporated by reference into the Registration Statement ("Prospectus Supplements"). Each "Prospectus Supplement" included a detailed description of that Issuing Trust and its respective Certificates. The Registration Statement, Prospectus and each of the respective Prospectus Supplements are collectively referred to herein as the "Offering Documents."

4. As set forth below, the Offering Documents contained materially false and misleading statements and omitted material information in violation of Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. Defendants are strictly liable for these misstatements under the Securities Act.

5. Morgan Stanley is a Wall Street investment bank that, through its various subsidiaries, provides financial products and services worldwide. MSMC originates mortgage loans and purchases residential mortgage loans through bulk purchases for securitization or resale. Many of the bulk mortgage loans purchased by MSMC were pooled together by MSC I and deposited into qualifying special purpose entities – the Issuing Trusts. These pools of loans were then securitized into mortgage-backed securities ("MBS") and sold by the Issuing Trusts and Underwriter Defendants to investors in the form of the Certificates. The Certificates were packaged in "tranches" by different levels of risk

and reward. The Certificates entitle investors to receive monthly distributions of interest and principal on cash flows from the mortgages held by the Issuing Trusts. As the original borrowers on each of the loans paid their mortgages, distributions were made to investors in accordance with the terms of the Certificates. If borrowers failed to pay back their mortgages, defaulted, or foreclosed, these losses flowed to investors based on the seniority of their Certificates.

6. Thus, the investment quality of the Certificates was necessarily linked to the quality of the mortgage loan pools held by each Issuing Trust. The Offering Documents included several representations regarding: (i) the underwriting standards used by the loan originators; (ii) the standards and guidelines used by MSMC when evaluating and acquiring the loans; (iii) the appraisal standards used to value the properties collateralizing the loans, and the corresponding loan-to-value ratios of the loans; (iv) the credit enhancement supporting the loan securitization process; and (v) the pre-established ratings assigned to each tranche of Certificates issued pursuant to the Offering Documents.

7. This action relates to Certificates issued by fourteen (14) Issuing Trusts (as set forth in ¶23, herein) purchased by Plaintiff and other Class members. While all of the Certificates were offered pursuant to the March 16, 2006 Registration Statement and Prospectus, each Issuing Trust issued its own Prospectus Supplement offering Certificates related only to its unique loan pool. Plaintiff Mississippi PERS purchased Series 2006-14SL Mortgage Pass-Through Certificates pursuant to the Prospectus Supplement filed by defendant Morgan Stanley Mortgage Loan Trust 2006-14SL ("MSML Trust 2006-14SL"). Each of the Prospectus Supplements is identical, or nearly identical, in substance, with exceptions related to the tabular data regarding the pool of loans underlying each series of Certificates.

8. The Certificates issued by each Issuing Trust were divided into several classes, or "tranches," which had different priorities of seniority, payment, exposure to risk and default, and interest payments. Defendants Moody's Corp., through its division Moody's Investor Service, Inc. ("Moody's"), and McGraw-Hill Companies, through its division, Standard & Poor's ("S&P"), directly and indirectly participated in and took steps necessary for the distribution of the Certificates. In addition, Moody's and S&P directly participated in the selection of the underlying mortgages to be

securitized and issued by each Issuing Trust. Moreover, as a condition to the issuance of the Certificates, Moody's and S&P rated the investment quality of the Certificates with pre-determined ratings. These ratings, which were expressly included in each of the Prospectus Supplements, in part, determined the price at which these Certificates were offered to Plaintiff and the Class. Moody's and S&P assigned investment-grade ratings on all tranches of the offered Certificates.

9. The highest investment rating used by Moody's is "Aaa." The highest rating used by S&P is "AAA." These ratings signify the highest investment-grade, and are considered to be of the "best quality," and carry the smallest degree of investment risk. Ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively. These ratings are considered "investment-grade ratings." Any instrument rated lower than BBB is considered below investment-grade, or "junk bond."

10. As alleged more fully below, the Offering Documents misstated and omitted material information regarding the quality of the loans underlying the Certificates and the process by which MSMC acquired those loans. Specifically, the Offering Documents failed to disclose, *inter alia*, that the loan originators had systematically ignored their stated and pre-established underwriting and appraisal standards and that MSMC ignored its purchasing guidelines and overpaid for underlying mortgages without regard to the quality of the loans for the sole purpose of increasing its position in the mortgage lending and securitization industry. Likewise, the underlying mortgages were based on collateral appraisals that overstated the value of the underlying properties.

11. As a result of the materially false and misleading statements in the Offering Documents, Plaintiff and the Class purchased Certificates that were far riskier than represented and that were not of the "best quality," or even "medium credit quality." Consequently, certain Certificate tranches represented to be investment-grade instruments were later revealed to be below investment-grade instruments, or "junk bonds." The downgrades in the ratings to below investment-grade caused the value of the Certificates to collapse. The Certificates continue to lose value as delinquencies, defaults and foreclosures related to the mortgages underlying the Certificates continue to increase. As a result, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, which explicitly states, "[e]xcept as provided in section 16(c) [15 U.S.C. § 77p(c)] no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court of the United States." Section 16(c) of the Securities Act refers to "covered class actions." This action asserts claims under the Securities Act and is not a "covered class action" within the meaning of Section 16(c), and therefore, pursuant to Section 22 of the Securities Act, this action is not removable. *See Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008).

13. Venue is proper in this Court because a substantial portion of the wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in Orange County. Further, defendants have availed themselves of the benefits of conducting business in Orange County and have engaged in numerous activities which had an effect in this County. As the chart below demonstrates, by an overwhelming amount, a great percentage of the underlying mortgages pooled in the Certificates of each of the fourteen Issuing Trusts were securitized by properties located in California, and the related underwriting and appraisals were conducted in California:

| **Trust** | **Concentration of CA Loans** | **Next highest Concentration (State)** |
|---|---|---|
| MSM 2006-4SL | 25% | 11% (NY) |
| MSM 2006-5AR | 45% | 9% (FL) |
| MSM 2006-5ARW | 45% | 9% (FL) |
| MSM 2006-6AR | 42% | 9% (FL) |
| MSM 2006-7 | 25% | 10% (TX) |
| MSM 2006-8AR | 34% | 14% (FL) |
| MSM 2006-9AR | 38% | 11% (FL) |
| MSM 2006-10SL | 25% | 12% (NY) |
| MSM 2006-11 | 23% | 10% (FL) |
| MSM 2006-12XS | 21% | 12% (FL) |
| MSM 2006-13AX | 42% | 9% (NV) |
| MSM 2006-14SL | 24% | 9% (NY) |
| MSM 2006-15XS | 22% | 10% (NY) |
| MSM 2006-16AX | 26% | 11% (FL) |

A substantial amount of those properties are believed to be located in Orange County. At times relevant to this action, MSMC, the entity that originated or otherwise acquired the loans related to this action, had "primary facilities" and core operations in Foothill Ranch, Orange County. Consequently, many of the witnesses that may be called to testify regarding the allegations herein reside and work in Orange County. Moreover, defendants promoted and sold the Certificates to investors located in California.

## III. THE PARTIES

### A. Plaintiff

14. Plaintiff Public Employees' Retirement System of Mississippi is a governmental defined benefit pension plan qualified under Section 401(a) of the Internal Revenue Code, and is the retirement system for nearly all non-federal public employees in the State of Mississippi. Established by the Mississippi Legislature in 1952, Mississippi PERS provides benefits to over 75,000 retirees, and future benefits to more than 250,000 current and former public employees. Mississippi PERS acquired Certificates pursuant and/or traceable to the Offering Documents. On August 18, 2007, Mississippi PERS purchased 1,325,000 Series 2006-14SL Mortgage Pass-Through Certificates issued by the MSML Trust 2006-14SL, each priced at $95.38.

### B. Defendants

15. Defendant Morgan Stanley is a Delaware Corporation with its principal executive office located at 1585 Broadway, New York, New York 10036. Morgan Stanley has more than 45,000 employees in offices around the world, including California. Morgan Stanley, through its subsidiaries and affiliates, provides various financial products and services to corporations, governments, financial institutions, and individuals worldwide. Morgan Stanley, through its subsidiary MSMC, created and controls MSC I, a limited purpose, wholly-owned finance subsidiary designed to facilitate the issuance and sale of the Certificates.

16. Defendant Morgan Stanley Mortgage Capital Inc. ("MSMC," as defined previously) is a New York corporation with its principal place of business located at 1585 Broadway, New York, New York 10036, and offices and core operations in Foothills Ranch, California. MSMC is an indirect

wholly-owned subsidiary of Morgan Stanley, and the parent of MSC I. MSMC is also an affiliate through common parent ownership of MSCo. MSMC provides warehouse and repurchase financing to mortgage lenders and purchases closed, first and subordinate-lien residential mortgage loans for securitization or resale. MSMC originates mortgage loans, or otherwise acquires residential mortgage loans through bulk purchases and also through purchases of single loans through MSMC's conduit loan purchase program. MSMC served as the "Sponsor" and "Seller" in the securitization of the Issuing Trusts; and, in coordination with MSCo, worked with ratings agencies, loan sellers and servicers in structuring the securitization transactions related to the Certificates.

17. Defendant Morgan Stanley Dean Witter Capital I Inc., f/k/a Morgan Stanley Capital I Inc. ("MSC I," as previously defined) is a Delaware corporation and a limited purpose, wholly-owned subsidiary of MSMC (and indirect subsidiary of Morgan Stanley), with its principal place of business located at 1585 Broadway, New York, New York 10036. MSC I is an affiliate, through common parent ownership, of MSCo. MSC I served in the role as "Depositor" in the securitization of the Issuing Trusts, and was an "Issuer" of the Certificates within the meaning of Section 15 of the Securities Act, 15 U.S.C. § 77b(a)(4).

18. Defendant Morgan Stanley & Co., Incorporated ("MSCo," as defined previously) is a Delaware corporation with its principal place of business located at 1585 Broadway, New York, New York 10036. MSCo is an affiliate, through common ownership, of MSMC and MSC I. MSCo acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11). As an underwriter, MSCo participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.

19. Defendant McGraw-Hill Companies is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020, and several offices located in California. Standard & Poor's ("S&P," as defined previously), a division of McGraw-Hill Companies, provides credit ratings, risk evaluation, investment research and data to investors. S&P acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11). S&P participated in the drafting and dissemination the Prospectus Supplements pursuant

to which the Certificates were sold to Plaintiff and other Class members. In addition, S&P worked with MSMC, loan sellers and servicers in structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

20. Defendant Moody's Corp. is a Delaware corporation with its principal place of business located at 250 Greenwich Street, New York, New York 10007, and a regional office in California. Moody's Investor Service, Inc. ("Moody's," as defined previously), a division of Moody's Corp., provides credit ratings, research and risk analysis to investors. Moody's acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11). Moody's participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. In addition, Moody's worked with MSMC, loan sellers and servicers in structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

21. Defendant McGraw-Hill Companies, inclusive of S&P, and defendant Moody's Corp., inclusive of Moody's, are collectively referred to herein as the "Rating Agency Underwriters."

22. Defendants MSCo, Morgan Stanley and the Rating Agency Underwriters are collectively referred to herein as the "Underwriter Defendants."

23. Defendants, the Issuing Trusts, were created and structured by MSC I to issue billions of dollars worth of Certificates pursuant to the Registration Statement and Prospectuses. For each offering by the Issuing Trusts, MSC I served as the "Depositor," MSCo served as a designated "Underwriter," and MSMC served as the "Sponsor"/"Seller." The following chart identifies (1) each Issuing Trust; (2) the stated value of the Certificates issued; and (3) the Registration Statement and Prospectus Supplement dates pursuant to which the Certificates were issued and sold.

| Amended Registration Statement | Issuing Trust | Prospectus Supplement Date | Principal Amount |
|---|---|---|---|
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-4SL | 3/27/2006 | $ 303,460,867 |

| | | | |
|---|---|---|---|
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-5AR | 3/27/2006 | $ 556,422,690 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-5ARW | 3/27/2006 | $ 150,000,000 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-6AR | 4/26/2006 | $ 1,037,398,613 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-7 | 5/25/2006 | $ 548,035,116 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-8AR | 5/25/2006 | $ 791,945,629 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-9AR | 7/20/2006 | $ 652,221,992 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-10SL | 7/25/2006 | $ 298,543,237 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-11 | 7/26/2006 | $ 682,377,191 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-12XS | 9/26/2006 | $ 521,285,533 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-13AX | 8/26/2006 | $ 608,919,208 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-14SL | 10/24/2006 | $ 353,987,132 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-15XS | 10/25/2006 | $ 671,388,000 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-16AX | 10/26/2006 | $ 956,299,494 |

24. . Defendants MSC I, Morgan Stanley and the Issuing Trusts are collectively referred to herein as the "Issuing Defendants."

25. Defendant Anthony B. Tufariello ("Tufariello") was, at all relevant times, the President (Principal Executive Officer) and Director of MSC I. Defendant Tufariello signed the Registration Statement. While serving as President of MSC I, defendant Tufariello was concurrently the Managing Director, Global Head of Securitized Products, of defendant Morgan Stanley.

26. Defendant William J. Forsell ("Forsell") was, at all relevant times, the Treasurer (Principal Financial Officer) and Controller of MSC I. Defendant Forsell signed the Registration

Statement. While serving as Treasurer of MSC I, defendant Forsell was concurrently the Assistant Treasurer of defendant Morgan Stanley.

27. Defendant Valerie H. Kay ("Kay") was, at all relevant times, a Director of MSC I. Defendant Kay signed the Registration Statement. While serving as a Director of MSC I, defendant Kay was concurrently a Managing Director of defendant Morgan Stanley.

28. Defendant Steven S. Stern ("Stern") was, at all relevant times, a Director of MSC I. Defendant Stern signed the Registration Statement. While serving as a Director of MSC I, defendant Stern was concurrently the Co-Head of the U.S. Principal Transaction Group, Real Estate Lending, of defendant Morgan Stanley.

29. Defendants Tufariello, Forsell, Kay, and Stern are collectively referred to herein as the "Individual Defendants."

## IV. FACTUAL BACKGROUND

### A. The Development Of The Secondary Mortgage Market And Subprime Mortgages

30. Traditionally, consumers wishing to finance the purchase of a house (or other property) were able to obtain a 30-year or 15-year fixed rate mortgage or a conventional adjustable rate mortgage ("ARM") through a mortgage lender that would profit by servicing the loans and collecting interest payments over the life of the mortgages. As such, the lender (or loan originator) had an interest in making sure that borrowers were able to repay their loans; or that loans were at least adequately collateralized in the case of default.

31. To increase available funds for borrowers, the U.S. government chartered Government Sponsored Enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The GSEs were empowered to buy mortgages (*i.e.*, the rights to repayment of the loans) from loan originators, thus developing a secondary market for mortgages. Once bought, the loans were pooled together, securitized and sold to investors as "mortgage backed securities," or "MBS." The money that a loan originator earned from the loan sales was then used to finance new mortgages, thereby increasing the lender's revenues.

32. Investors who purchased MBS would (typically) receive monthly payments over the lifetime of the underlying loans, in accordance with the borrowers' payments of principal and interest. To protect MBS investors, the GSEs only purchased loans that met approved underwriting standards. In addition, the prices of the MBS were discounted to account for an assumed rate of default or non-payment of a certain percentage of loans.

33. From 1995 to 2005, the housing market experienced a dramatic rise in home ownership. According to the Research Department of the Federal Reserve Bank of San Francisco ("FRBSF"), after decades of relative stability, the rate of U.S. homeownership began to surge as 12 million more Americans became homeowners between 1994 and 2004. The increased demand also resulted in a growth in new home construction. In 2005, according to the U.S. Census Bureau, 1,283,000 newly-constructed single-family houses sold, compared with an average of 609,000 per year from 1990 to 1995.

34. Investment banks such as Morgan Stanley and other entities became active in and profited from the lucrative secondary market for mortgage loans. Unlike GSEs, investment banks were not constrained by the same strict conditions and restrictions when purchasing loans from loan originators. As the secondary market for loans originated with less stringent underwriting standards expanded, loan originators were increasingly able to lend to borrowers with higher credit-risk profiles without absorbing all of the increased risk. In exchange for the increased risk of default and/or delinquencies, the loan originators provided the loans at higher interest rates – *i.e.*, subprime loans – with higher potential rates of return, due to the higher interest percentage charged to the borrowers and thus the higher rate of return to investors in the secondary market.

35. In recent years, several factors led to greater demand for subprime and altemative loan mortgages in the secondary market. Perhaps the most significant factor was the introduction of new pricing models, the Gaussian copula models developed by David X. Li, which allowed for rapid pricing of exotic finance structures that relied upon pooled mortgages and MBS. The increased demand in the secondary market, along with persistent low interest rates and low inflation (perhaps caused by the increased demand in the secondary market), facilitated consumer borrowing.

36. Concurrently, as loan originators increased the amount of loans sold rather than held and serviced, they became less vigilant in guarding against the risk of defaults and delinquencies because they were able to quickly transfer the risk to purchasers in the secondary market. Loan fees and sales revenue became the lender's primary profit mechanism, making the sheer quantity of loans issued more important than the quality of any particular loan. To facilitate more loans, lenders began to offer more aggressive loan products such as subprime mortgages, hybrid loans and negative amortization "option ARM" loans, with little or no documentation. In addition, it is now known that loan originators abandoned their stated underwriting and appraisal standards, and other methods of risk assessment, in order to increase loan origination quantities.

37. According to Harvard University's Joint Center for Housing Studies, between 2001 and 2005, the subprime market grew from just $210 billion (in real terms) to $625 billion, amounting to approximately 20% of the total residential loans originated in 2005. The FRBSF observed that "it seems probable that the growth in the subprime market [gave] many households access to credit that would previously have been denied." This time period also saw a dramatic growth in Alt-A loans, a characteristic of which was reduced or eliminated documentation required to secure a mortgage (commonly referred to as a "liar loan"). According to a report by rating agency S&P, Alt-A originations increased from less than $20 billion in 2000 to more than $300 billion in 2005.

38. The end result was a mortgage paradigm shift where loan originators allowed consumers to borrow more money than they could afford to repay. As consumers were able to borrow more, they were able to spend more. Accordingly, housing prices kept rising. In that environment, consumers who were unable to repay their loans could simply borrow more money (against increased equity) or sell their house at a perpetually increasing price to other consumers – who likely borrowed more than they could afford to repay, as well. Thus, in the sky-rocketing housing market, the effects of the loan originators' over-aggressive lending practices were not immediately realized.

39. Eventually, however, the aggressive lending practices overburdened the housing market. Housing prices peaked, loan volume leveled-off and loan defaults and delinquencies started to rise. Without underlying repayment revenues and adequate collateral value to support MBS, the credit

market began deteriorating and investors in mortgaged-backed instruments, directly or through derivative instruments such as mortgage pass-through certificates, experienced tremendous losses.

B. The Mechanics Of Structuring Mortgage Pass-Through Certificates

40. Mortgage pass-through certificates are securities in which the holder's interest represents an equity interest in the "issuing trust." The pass-through certificates entitle the holder to income payments from pools of mortgage loans and/or MBS. Although the structure and underlying collateral of the mortgages and MBS vary, the basic principle is the same.

41. First, a "depositor" acquires an inventory of loans from a "sponsor"/"seller," who either originated the loans or acquired the loans from other loan originators, in exchange for cash. The type of loans in the inventory may vary, including conventional, fixed or adjustable rate mortgage loans (or mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to maturity. The depositor then transfers, or deposits, the acquired pool of loans to the issuing trust entity.

42. The issuing trust then securitizes the pool of loans so that the rights to the cash-flows from the inventory can be sold to investors. The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches." Although technically different instruments, tranches are related MBS offered as part of the same pass-through certificate offering, each with a different level of risk and reward. Any losses to the underlying loans, due to default, delinquency or otherwise, are applied in reverse order of seniority. As such, the most senior tranches of pass-through certificates are often rated as the best quality, or "AAA." Junior tranches, which usually obtain lower ratings, ranging from "AA" to "BBB-," are less insulated from risk, but offer greater potential returns.

43. By working with the underwriters, the depositor, and the rating agencies, the issuing trust is able to ensure that each particular mortgage pass-through certificate tranche will receive a pre-determined rating by pre-determined rating agencies at the time of offering.

44. Once the tranches are established, the issuing trust passes the certificates back to the depositor, who then passes the certificates to one or more underwriter. The underwriter offers the

various certificates to investors, in exchange for cash that will be passed back to the depositor, minus any fees owed to the underwriters.




45. Each purchased or acquired certificate represents an equity interest in the issuing trust and the right to future payments of principal and interest on the underlying loans. Those payments are collected by the loan servicer and distributed, through the issuing trust, to investors at regular distribution intervals throughout the life of the loans.

46. Mortgage pass-through certificates must be offered to the public pursuant to a registration statement and prospectus in accordance with the provisions of the Securities Act.

C. <u>Assessing The Quality Of A Mortgage Pass-Through Certificate Investment</u>

47. The fundamental basis upon which certificates are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral. Thus, proper loan underwriting is critical to assessing the borrowers' ability to repay the loans, and a necessary consideration when purchasing and pooling loans. If the loans pooled in the MBS were to suffer defaults and delinquencies in excess of the assumptions built into the certificate payment structure, as set forth in the offering prospectus, certificate owners would suffer more than expected losses as income necessary to service the certificates would necessarily diminish.

48. Likewise, independent and accurate appraisals of the collateralized real estate are essential to ensure that the mortgage or home equity loan can be satisfied in the event of a default and foreclosure on a particular property. In the event of a foreclosure, an accurate appraisal is necessary to determine the likely price at which the foreclosed property can be sold and thus the amount of money that issuing trust would receive and be able to pass through to certificate holders.

49. An accurate appraisal is also critical to calculating loan-to-value ("LTV") ratio, which is a financial metric commonly used to evaluate the price and risk of MBS and mortgage pass-through certificates. The LTV ratio expresses the amount of mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a borrower seeks to borrow $90,000 to purchase a home worth $100,000, the LTV ratio is equal to $90,000 divided by $100,000, or 90%. If, however, the appraised value of the house has been artificially inflated to $100,000 from $90,000, the real LTV ratio would be 100% ($90,000 divided by $90,000).

50. From an investor's perspective, a high LTV ratio represents a greater risk of default on the loan. First, borrowers with a small equity position in the underlying property have "less to lose" in the event of a default. Second, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which might cause the borrower to default and would prevent the issuing trust from recouping its expected return in the case of foreclosure and subsequent sale of the property.

51. Consequently, the LTV ratios of the loans underlying mortgage pass-through certificates are important to investors' assessment of the value of such certificates. Indeed, prospectuses typically provide information regarding the LTV ratios, and even guarantee certain LTV ratio limits for the loans that will support the offered certificates.

52. The underwriting standards and appraisals of the pooled loans are critically important considerations when setting assumptions and parameters for each certificate tranche. The assumed amount of expected payments of principal and interest will necessarily affect the total available funds and potential yield to investors. In addition, the assumed amount of expected payments will affect the offered credit enhancement, such as overcollateralization, excess interest, shifting of interests, and subordination.

53. Overcollateralization is the amount by which the aggregate stated principal balance of the mortgage loans exceeds the aggregate class principal balance for the certificate tranches. In other words, overcollateralization serves as a cushion, so that in the case of default on certain loans, the

remaining payments would be adequate to cover the yield on all certificates without any tranche taking a loss.

54. A similar cushion is provided by the interest generated by the loans in excess of what is needed to pay the interest on the certificates and related expenses of the trust. Often, the tranches are structured so that the weighted average interest rate of the mortgage loans is higher than the aggregate of the weighted average pass-through rate on the certificates, plus servicing fee rates on the mortgage loans.

55. If the assumed underwriting standards and appraisals are inaccurate, or the loan purchasing guidelines used to acquire those loans are disregarded, the stated credit enhancement parameters will be inaccurate, and investors will not receive the level of protection as set forth in the respective registration statement and prospectus(es).

D. The Role Of The Ratings Agencies In Structuring And Rating Certificates

56. Traditionally, rating agencies published ratings to reflect an unbiased assessment of risk associated with a particular investment instrument. Historically, an overwhelming majority of the rating agencies' revenues were generated by fees from subscribers who received their research and ratings. In the structured finance arena (*i.e.*, mortgage pass-through certificates and other MBS), however, rating agencies often played an active role in structuring the very instruments that they rated – and they received lucrative fees for their services.

57. The rating of any particular MBS was critical to its issuance because of regulations requiring many institutional investors, such as banks, mutual funds and public pension funds, to hold only "investment-grade" bonds and securitized interests. Indeed, many MBS – including mortgage pass-through certificates – were geared towards, and promoted to, institutional investors. Here, in fact, each of the Prospectus Supplements stated, "Certificates May Not Be Appropriate for Individual Investors."

58. As reported in the *International Herald Tribune*, the rating agencies did "much more than evaluate [MBS instruments] and give them letter grades," they played an "integral role" in structuring the transactions and instructing the assemblers "how to squeeze the most profit out" of the

MBS by maximizing the tranches with the highest ratings. Now, it is evident that these credit rating agencies indirectly and directly participated in and took steps necessary to the distribution of mortgage pass-through certificates and other MBS.

V. CERTIFICATES OFFERED BY DEFENDANTS

59. In theory, the loan securitization process entails a series of "arm's-length" transactions where the certificates are valued, appropriately priced and sold to investors. The depositor pays a fair price to the sponsor/seller based on the represented quality of the pool of loans. The depositor then verifies the quality of the loans and transfers them to the issuing trust. The depositor then works with the underwriters to assess the likely cash-flows from the loan repayments and, based on those calculations, sets the parameters and expected yield of each certificate tranche that the underwriter will offer to investors.

60. In this case, however, the transactions were not arm's-length transactions. To the contrary, Morgan Stanley controlled all of the entities involved at all stages of the process.

61. Morgan Stanley, through MSMC, established MSC I for the sole purpose of issuing the Certificates. On March 14, 2006, MSC I filed with the SEC the Registration Statement and Prospectus, identifying itself as the "Depositor" of a to-be-determined series of Certificate offerings, pursuant to forthcoming Prospectus Supplements.

62. The Prospectus and Prospectus Supplements provided information to investors about the Certificates in more detail in progression. First, the Prospectus provided general information regarding the Certificate offerings. Then, the respective Prospectus Supplements provided the specific terms of the particular Certificate series offering. To the extent that the Prospectus presented multiple options, investors were told to rely on the information in the Prospectus Supplement as to the applicable option.

63. The Prospectus filed on March 14, 2006 provided that MSC I would offer a series of Certificates representing beneficial ownership interests in the related Issuing Trusts and that the assets of each trust would consist of (i) conventional, fixed or adjustable interest rate mortgage loans secured by first liens or junior liens, or first and junior liens on one- to four-family residential properties, including mortgage participations; (ii) mortgage pass-through certificates and mortgage-backed

securities; (iii) direct obligations of the United States or other governmental agencies; or (iv) any combination of the preceding.

64. Subsequent to filing the Prospectus, MSC I caused to be filed Prospectus Supplements for each of the Issuing Trusts. For example, on October 24, 2006, MSC I filed with the SEC a Prospectus Supplement offering Series 2006-14SL Mortgage Pass-Through Certificates on behalf of the MSML Trust 2006-14SL Issuing Trust.

65. In the Prospectus and each of the respective Prospectus Supplements, MSC I was identified as the Depositor for the Issuing Trusts' Certificate offerings. While MSC I served as the Depositor for each of the Issuing Trusts, it was directed and controlled by its parent MSMC and Morgan Stanley.

66. The Registration Statement, and each of the respective Prospectus Supplements, identified MSMC as the "Sponsor" and "Seller" of the loans acquired by the Depositor, MSC I. While MSMC served as the Sponsor and Seller for each of the Issuing Trusts, it was directed and controlled by Morgan Stanley.

67. According to the Registration Statement and Prospectus Supplements, MSMC originated the loans or otherwise acquired them through bulk or single purchases pursuant to its conduit loan purchase program. A pool of loans was then sold to the Depositor and passed-through to the Issuing Trusts.

68. MSC I, the Depositor, then worked with the Underwriter Defendants and MSMC to structure the securitization transactions and price the Certificates. Per the Registration Statement, Prospectus and Prospectus Supplements, MSCo was a designated "Underwriter." In addition, by way of their actual participation and conduct in structuring the transactions, the Rating Agency Underwriters directly and indirectly participated in the distribution process. Specifically, the Rating Agency Underwriters participated in structuring the transactions and, as a condition to the issuance of the Certificates, provided investment-grade ratings as detailed in each of the Prospectus Supplements.

69. As stated in the Prospectus and the Supplemental Prospectuses, MSCo, as a designated Underwriter, purchased the Certificates and offered them to investors, including Plaintiff and other

Class members. The proceeds from those sales were then transferred to MSC I (the Depositor), minus applicable underwriting fees.

## VI. DEFENDANTS MISREPRESENTED THE NATURE OF THE LOANS UNDERLYING THE CERTIFICATES

70. The Offering Documents contained material statements regarding, *inter alia*, (i) the underwriting process and standards by which the loans held by the respective Issuing Trusts were originated, including the type of loan and documentation level; (ii) the standards and guidelines used by MSMC when evaluating and acquiring the loans; (iii) a representation of the value of the underlying real-estate securing the loans pooled in the respective Issuing Trusts, in terms of LTV averages and the appraisal standards by which such real estate values were measured; and (iv) the level of credit enhancement, such as overcollateralization and excess interest, calculated to afford a certain pre-determined level of protection to investors.

71. Each Prospectus Supplement included tabular statistics concerning the loans underlying the Certificates, including (but not limited to) the type of loans, the number of loans, the weighted average mortgage rate, the aggregate scheduled principal balance of the loans, the weighted average original combined LTV ratio, and the geographic concentration of the mortgaged properties (in excess of 10% of the aggregate scheduled principal balance).

### A. Representations Regarding Loan Origination Underwriting

72. Although the percentages vary among the Issuing Trusts, the Prospectus Supplements state that MSMC originated or purchased from various correspondent lenders most of the mortgage loans underlying the Certificates, and that the remaining loans in the pool were originated by one or more originators. For example, the MSML Trust 2006-14SL Prospectus Supplement states that MSMC originated or purchased approximately 90.43% of the loans underlying the Series 2006-14SL Certificates. Where more than 10% of the loans were originator by any particular loan originator, that originator was identified in the Prospectus Supplement.

73. The Prospectus Supplements represented that the mortgage loans underlying the Certificates "have been acquired by the Seller in the normal course of its business" and that "[a]ll of the

Mortgage Loans were underwritten by the Originators substantially in accordance with the related underwriting criteria specified" in the Prospectus Supplement.[2]

74. As represented in the Prospectus Supplements, prior to acquiring any of the residential mortgage loans, MSMC stated that it conducted a review of the related mortgage loan seller based upon the credit quality of the selling institution. The review process included reviewing select financial information for credit risk and assessment, an underwriting guideline review, senior level management discussions, and/or background checks. The scope of MSMC's purported due diligence varied based upon the credit quality of the mortgage loans.

75. In addition, the Prospectus Supplements represented that each of the loan originators, and in certain circumstances the Seller, MSMC, represented and warranted that ***each*** of the loans originated and/or sold by it was underwritten in accordance with standards consistent with those utilized by mortgage lenders generally during the period of origination. The Seller, MSMC, represented and warranted that each of the loans sold by it conformed to the requirements of its seller guide.

76. Furthermore, the Prospectus Supplements represented that each loan mortgagor will have been required to complete an application ***designed to provide the original lender pertinent credit information concerning the mortgagor*** and, as part of the description of the mortgagor's financial condition, the mortgagor will have furnished information with respect to his, her, or its assets, liabilities, income (with some noted exceptions), credit history, employment history and personal information.

77. As noted, the Prospectus Supplements indicated that certain of the loans underlying the Certificates were issued under "alternative, reduced documentation, no-stated-income, no-documentation, no-ratio or stated income/stated assets programs, which require less documentation or verification than do traditional full documentation programs." A statistical breakdown of the loans

---

[2] As is generally the case, the Prospectus Supplements for each Issuing Trust uniformly used the same or substantially similar language.

categorized by documentation level category is included in the Prospectus Supplement for each Issuing Trust.

78. Accordingly, pursuant to the "Trust Agreement" and "Mortgage Loan Purchase Agreement" (as defined in the Prospectus and/or Prospectus Supplements), the Seller, MSMC, made certain representations, warranties and covenants related to certain Mortgage Loans.

B. Representations Regarding Appraisals

79. As stated in the Prospectus Supplements, MSCM's decision to purchase loans in some cases may have been based primarily or entirely on the appraisal of the mortgaged property and the LTV ratio at origination. Indeed, the Prospectus Supplements represent an assumption that ***the related mortgaged properties provide adequate security for the mortgage loans***.

80. As set forth in the Prospectus Supplements, the adequacy of the mortgaged property as security for repayment of the loans will have generally been determined by an appraisal in accordance with pre-established guidelines conforming to the Uniform Standards of Professional Appraisal Practice ("USPAP"), as adopted by the Appraisal Standards Board of the Appraisal Foundation, and on forms acceptable to Fannie Mae and/or Freddie Mac.

81. With respect to real estate appraisals, USPAP requires, *inter alia*:

> An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.
>
> In appraisal practice, an appraiser must not perform as an advocate for any party or issue.
>
> An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.
>
> * * *
>
> It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:
>
> 1. the reporting of a predetermined result (*e.g.*, opinion of value);
> 2. a direction in assignment results that favor the cause of the client;
> 3. the amount of a value opinion;
> 4. the attainment of a stipulated result; or

> 5. the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

82. In addition, the Prospectus Supplements represented that the appraisal procedure guidelines used by the loan originators generally will have required the appraiser or agent on its behalf to personally inspect the property and to verify whether the property was in good condition. Furthermore, the appraisal will have been based on market data analysis of recent sales of comparable properties and, when applicable, analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

83. The Prospectus Supplements provide information regarding the weighted average combined original LTV ratio of the loans underlying the Certificates. The "Combined LTV Ratio" of a mortgage loan is defined in the Prospectus Supplements as

> … a fraction expressed as a percentage, the numerator of which is the principal balance of the related Mortgage Loan at the date of determination, plus the principal balance of each mortgage loan senior thereto based upon the most recent information available to the Seller and the denominator of which is (a) in the case of a purchase, the lesser of the selling price of the Mortgaged Property and its appraised value determined in an appraisal obtained by the originator of such Mortgage Loan, or (b) in the case of a refinance, the appraised value of the Mortgaged Property at the time of such refinance.

84. The Combined LTV Ratio is provided in the Prospectus Supplement, in association with various loan groupings, including by loan type and documentation level, property type and geographical location. As stated in the Prospectus Supplements, "***No Mortgage Loan had a Combined Loan-to-Value Ratio at origination of more than 100%***."

C. <u>Representations Regarding Credit Enhancement</u>

85. Defendants, in structuring the Certificate tranche parameters, provided for certain "Credit Enhancement," as set forth in the Prospectus Supplements. Credit Enhancement is intended to provide protection to the holders of the Certificates against shortfalls in payments received on the mortgage loans and helps increase the likelihood of the receipt of all payments under the agreements pursuant to which the Certificates are issued. The Certificate securitization and offering transactions provide various forms of credit enhancement, including subordination, shifting interests,

overcollateralization and excess interest. Each form of credit enhancement is necessarily dependant on the application and effectiveness of the originator's underwriting standards, as well as an accurate appraisal of the mortgaged real estate and the corresponding LTV ratio.

86. Each of the Prospectus Supplements represented a pre-determined amount of overcollateralization, as well as an overcollateralization floor amount with respect to a yield distribution date. For example, the MSML Trust 2006-14SL Prospectus Supplement states that the overcollateralization amount with respect to the Series 2006-14SL Certificates will be 6.4% of the aggregated "Stated Principal Balance on the Mortgage Loans" ($353,987,000), or approximately $22,655,168. Similarly calculated, the overcollateralization floor amount for any particular distribution day is equal to approximately $1,769,935.

87. In addition, the Certificate securitization and offering transactions were structured such that the loans were expected to generate more interest than was needed to pay interest on the Certificates (and related expenses of the Issuing Trust). Specifically, the weighted average interest rate of the mortgage loan was expected to be higher than the aggregate of the weighted average pass-through rate on the Certificates, plus the servicing fee rate on the mortgage loans.

88. The credit enhancements represented in the Prospectus Supplements directly impact and correlate with the representations regarding the ratings assigned to each Certificate tranche in a series offering. As stated in the Prospectus Supplements, "[t]he ratings assigned to mortgage pass-through certificates address the likelihood of the receipt of all payments on the Mortgage Loans by the Certificate holders under the agreements pursuant to which such [C]ertificates are issued. Such ratings take into consideration the credit quality of the Mortgage Loans, including any credit support providers, structural and legal aspects associated with such [C]ertificates, and the extent to which the payment stream on the Mortgage Pool is adequate to make the payments required by such [C]ertificates." MSML Trust 2006-14SL.[3]

---

[3] As is generally the case, the Prospectus Supplements for each Issuing Trust uniformly used the same or substantially similar language.

89. Here, the Rating Agency Underwriters worked directly with the Underwriter MSCo, Depositor MSC I and Sponsor/Seller MSMC to structure the Certificate transactions to achieve certain ratings. In fact, it was a condition of the issuance of the Certificates that each tranche in the series receive the respective ratings as set forth in the Prospectus Supplements.

D. Defendants' Representations Failed To Disclose The True Risk Of Investing In The Certificates

1. The Deterioration Of Underwriting Standards

90. From 1995 to 2005, the housing market experienced a dramatic rise in home ownership, as 12 million more Americans became homeowners between 1994 and 2004. Likewise, in recent years, the subprime market has grown dramatically, enabling more and more borrowers to obtain credit who traditionally would have been unable to access it. According to Inside Mortgage Finance, from 1994 to 2006, subprime lending increased from an estimated $35 billion, or 4.5 percent of all one-to-four family mortgage originations, to $600 billion, or 20% of originations.

91. As detailed above, Wall Street aggressively pushed into the complex, high-margin business of packaging mortgages and selling them to investors as MBS, including mortgage pass-through certificates. This aggressive push created a boom for the mortgage lending industry. By buying and packaging mortgages, Wall Street enabled the lenders to extend credit even as the dangers grew in the housing market. At the center of the escalation was Wall Street's partnership with subprime lenders. This relationship was a driving force behind the once-soaring home prices and the spread of exotic loans that are now defaulting and foreclosing in record numbers.

92. Morgan Stanley, seeking to compete with its Wall Street peers and to expand its share of the mortgage securities market, reached out to subprime lenders for the purchase of subprime loans. According to a December 6, 2007 article in *The New York Times*, "Wary of Risk, Bankers Sold Shaky Mortgage Debt," Morgan Stanley cultivated a relationship with New Century Financial, one of the largest subprime lenders. As a result of this relationship, Morgan Stanley expanded its subprime underwriting business by 25% from 2004 to 2006. According to a former New Century executive, Morgan Stanley agreed to pay above-market prices for loans in return for a steady supply of mortgages.

According to the article, the former New Century executive said: "Morgan would be aggressive and say, 'We want to lock you in for $2 billion a month.'"

93. As is now evident, far too much of the lending in recent years was neither responsible nor prudent. According to Ben S. Bernanke, Chairman of the Federal Reserve Board, in a March 14, 2008 speech at the National Community Reinvestment Coalition Annual Meeting, "[t]he deterioration in underwriting standards that appears to have begun in late 2005 is another important factor underlying the current crisis. A large share of subprime loans that were originated during this time feature high combined loan-to-value ratios and, in some cases, layers of additional risk factors, such as a lack of full documentation or the acceptance of very high debt-to-income ratios."

94. In its March 2008 Policy Statement on Financial Market Developments, the President's Working Group on Financial Markets concluded that "[t]he turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages, beginning* in late 2004 and extending into early 2007." (Emphasis in original). As U.S. housing prices subsequently declined, the delinquency rate for such mortgages soared.

95. The rapid increase in mortgage defaults and home foreclosures between 2006 and 2008, during the time when Morgan Stanley had expanded its mortgage-related business in an attempt to compete with its Wall Street competitors and was purchasing subprime loans at above-market prices from New Century, compromised the quality of the mortgages pools underlying the Certificates and thus diminished the value of the Certificates. In fact, according to data from Moody's, loans made by New Century now have some of the highest default rates in the industry – almost twice those of competitors like Wells Fargo and Ameriquest.

96. As a result, the government has launched numerous investigations into the subprime mortgage lending industry, including Morgan Stanley. In January 2008, the FBI announced criminal investigations into 14 mortgage lenders. By April of 2008, the FBI's investigations had expanded to 19 mortgage lenders. The government's investigations focused on subprime mortgage lending practices by major banks and companies.

97. In May 2008, the FBI and the criminal division of the Internal Revenue Service formed a task force to examine mortgages that were made with little or no proof of the earnings or assets of borrowers. The task force includes federal prosecutors in New York, Los Angeles, Philadelphia, Dallas and Atlanta. The task force is focusing on the role of mortgage lenders and brokers in low- or no-documentation loans, and is also examining how the loans were bundled into securities.

2. Inadequate Due Diligence Of Underwriting Standards

98. Morgan Stanley and other investment banks contracted with external firms to review whether the loans included in MBS that they underwrote were in compliance with the loan originators' represented standards. Morgan Stanley was a noted client of Clayton Holdings, Inc. ("Clayton"). In June of 2007, the New York Attorney General subpoenaed documents from Clayton and another due diligence firm, Bohan Group ("Bohan"), seeking information regarding whether the investment banks withheld information that should have been disclosed to investors. Similar subpoenas were issued by the SEC and Massachusetts and Connecticut regulators.

99. On January 27, 2008, the New York Attorney General entered into an agreement with Clayton for immunity from prosecution in exchange for additional documents and testimony regarding its due diligence reports. Both *The New York Times* and *Wall Street Journal* published articles detailing the agreement and Clayton's expected testimony. According to *The New York Times* (Anderson, J. and Bajaj, V., "Reviewer of Subprime Loans Agrees to Aid Inquiry of Banks," Jan. 27, 2008), Clayton communicated daily with bankers putting together securities," and that "starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending exceptions." In response, rather than change the "broad language written in prospectuses" to reflect the environment, "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

100. A more recent article in the *Los Angeles Times* (Reckard, E., "Sub-prime Mortgage Watchdogs Kept On Leash; Loan Checkers Say Their Warnings of Risk Met With Indifference," March 18, 2008) revealed that Clayton and Bohan employees "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as

borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored, and stricken from the reports."

101. In its most recent annual report, filed on Form 10-K with the SEC on January 28, 2008, Morgan Stanley confirmed that it is under direct investigation and is "responding to subpoenas and requests for information from certain regulatory and Governmental entities concerning the origination, purchase, securitization and servicing of subprime and non-subprime residential mortgages and related issues."

### 3. The Investment-Grade Ratings Misrepresented The True Risk Of The Certificates

102. As detailed above, the Rating Agency Underwriters directly participated in structuring the securitization transactions underlying the Certificates and, as a condition to the issuing of the Certificates to the public, provided pre-determined ratings for the Certificates. These pre-determined credit ratings were, for virtually all tranches of the offered Certificates, investment-grade. Moody's and S&P maintained investment-grade ratings on the Certificates until, at the earliest, December 20, 2007, and for certain senior tranches, until late August 2008.

103. The ratings provided by the Rating Agency Underwriters did not represent the true risk of the Certificates, as they were based on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default. The President's Working Group on Financial Markets, Policy Statement Financial Market Developments (March, 2008), confirms that there were flaws in credit rating agencies' assessments of subprime MBS and other complex structured financial products, such as mortgage pass-through certificates.

104. Internal rating agency emails discovered and released by U.S. Congressional investigators reveal that some Rating Agency Underwriter employees suspected before the credit markets deteriorated that the Rating Agency Underwriters used lax standards for rating MBS. For example, one email between colleagues at S&P stated, "Rating agencies continue to create and [sic] even bigger monster – the CDO market. Let's hope we are all wealthy and retired by the time this

house of cards falters."[4] As J.P. Morgan CEO Jamie Dimon observed, "There was a large failure of common sense. Very complex securities should not have been rated as if they were easy to value bonds."

105. Consequently, on June 11, 2008, the SEC proposed new rules that would, *inter alia*, prohibit rating agencies from issuing ratings on a structured product, including mortgage pass-through certificates, unless information on the assets underlying the product was made available; prohibit credit rating agencies from structuring the same products they rate; and require the public disclosure of the information used by credit rating agencies in determining a rating on a structured product, including information on the underlying assets.

## VII. MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

106. The Registration Statement for the Issuing Trusts contained an illustrative form of a prospectus for use in the offering of the Certificates. The Registration Statement was prepared by the Issuing Defendants and Underwriter Defendants, and signed by the Individual Defendants. Along with the Registration Statement, the Prospectus was filed providing details of the Certificate offerings. The Prospectus was prepared by the Issuing Defendants and the Underwriting Defendants. Subsequently, Prospectus Supplements were filed with the SEC containing a detailed description of the mortgage pools underlying the Certificates and making certain representations about the loan origination process and the quality of the loans. The Prospectus Supplements were prepared by the Issuer Defendants and the Underwriter Defendants. The Rating Agency Underwriters directly participated in the structuring of the mortgage pools, and as a condition of the issuance of the Certificates, provided the investment-grade ratings predetermined in the Prospectus Supplements. The Underwriter Defendants sold the Certificates pursuant to the Prospectus Supplements. The Prospectuses were referenced and incorporated into the Registration Statement.

---

[4] Collateralized debt obligations, or "CDOs," are a type of asset-backed security and structured credit product, structured similarly to mortgage pass-through certificates.

107. The Registration Statement and the Prospectuses stated the "Loan Purchasing Guidelines and Underwriting Standards" concerning the loans underlying each of the Certificates offered pursuant to the Registration Statement. Specifically, the Registration Statement stated:

> Each of the Originators, and in certain circumstances the Seller, will represent and warrant that each of the Mortgage Loans originated and/or sold by it was underwritten in accordance with standards consistent with those utilized by mortgage lenders generally during the period of origination. The Seller will represent that and warrant that each of the Mortgage Loans sold by it conformed to the requirements of the seller guide.

108. Each of the Prospectus Supplements identified loan originators that accounted for greater than ten percent of the loans in the mortgage pools underlying the Certificates, if applicable. For each such circumstance, that Prospectus Supplement provided representations regarding the underwriting standards utilized by that loan originator.

109. The Morgan Stanley Mortgage Loan Trust 2006-8AR, Morgan Stanley Loan Trust 2006-7, and Morgan Stanley Loan Trust 2006-8AR Prospectus Supplements listed Morgan Stanley Credit Corporation ("MSCC") as a loan originator accounting for more than ten percent of the respective loans in the mortgage pools underlying those Issuing Trusts, and represented that:

> MSCC's origination guidelines for Mortgage Loans use a combination of automated and judgmental underwriting criteria to evaluate credit risk, and this risk assessment may affect documentation requirements. MSCC's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral. A prospective borrower applying for a mortgage loan is required to submit an application in writing or via telephone, which elicits pertinent information about the prospective borrower, including the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired. MSCC employs underwriters to scrutinize the prospective borrower's credit profile.
>
> * * *
>
> A potential borrower's ability to make the proposed loan payments is measured by the applicant's income, credit, residence stability and assets. One test to determine this ability is the debt-to-income ratio, which is the borrower's total monthly debt service divided by total monthly gross income. MSCC typically allows for a debt-to-income ratio of 45%. Debt-

> to-income exceptions must be approved by the appropriate level underwriter, and supported by compensating factors.
>
> The adequacy of the mortgaged property as security for the proposed mortgage loan will generally be determined by an appraisal or automated property valuations acceptable to MSCC. Appraisals are conducted by independent appraisers acceptable to MSCC. The appraisals generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, on income generated from the property.

110. The Morgan Stanley Mortgage Loan Trust 2006-11 and Morgan Stanley Loan Trust 2006-15XS Prospectus Supplements listed American Home Mortgage Corp. ("AHM") as a loan originator accounting for more than ten percent of the respective loans in the mortgage pools underlying those Issuing Trusts, and represented that:

> The ["conforming or "prime"] mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginne Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines of the Originator.
>
> The Originator's non-conforming underwriting guidelines are similar to those of the government sponsored enterprises Fannie Mae and Freddie Mac, but these loans are "non-conforming" in that they may not conform to the maximum loan amounts and in some cases underwriting guidelines of Fannie Mae and Freddie Mac. These non-conforming loans do not conform to and are not insurable by the Federal Housing Administration nor can they be guaranteed by the U.S. Department of Veterans Affairs.
>
> The Originator's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.

111. The Morgan Stanley Mortgage Loan Trust 2006-12XS Prospectus Supplement listed First National Bank of Nevada ("FNBN") as a loan originator accounting for more than ten percent of the loans in the mortgage pool underlying that Issuing Trust, and represented that:

> All of the mortgage loans have been originated under FNBN's "full" or "alternative" underwriting guidelines (i.e., the underwriting guidelines

> applicable to the mortgage loans typically are less stringent than the underwriting guidelines established by Fannie Mae or Freddie Mac primarily with respect to the income and/or asset documentation which borrower is required to provide). To the extent the programs reflect underwriting guidelines different from those of Fannie Mae or Freddie Mac, the performance of the mortgage loans thereunder may reflect relatively higher delinquency rates and/or credit losses. In addition, FNBN may make certain exceptions to the underwriting guidelines described herein if, in FNBN's discretion, compensating factors are demonstrated. . . .
>
> FNBN's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral. . . .

112. The Morgan Stanley Mortgage Loan Trust 2006-8AR Prospectus Supplement listed First Wachovia Mortgage Corp. ("Wachovia") as a loan originator accounting for more than ten percent of the loans in the mortgage pool underlying that Issuing Trust, and represented that:

> *Prime Products*: Wachovia manually underwrites every Jumbo A Fixed Rate, Jumbo LIBOR ARM and Jumbo Alt-A Fixed Rate/ARM loan and generally follows Fannie Mae guidelines. Wachovia uses Custom Desktop Underwriter to supplement the underwriting of the Jumbo A Fixed Rate and the Jumbo LIBOR ARM loans to ensure the consistent and objective application of risk evaluation; however, income/asset documentation, credit requirements, collateral documentation must be met for each product. . . . The collateral Review Team, consisting of trained appraisers, is available to assist underwriters with reviews of appraisals on more difficult properties. The Investor Relations team supports underwriters by requesting single loan variances from investors and assisting all production channels with underwriting clarification and oversight. The online Products and Underwriting manual is available to every employee and updated twice monthly.
>
> Wachovia's non-conforming (jumbo) guidelines are provided to its whole loan investors on an ongoing basis for review and acceptability. Loans are documented generally in accordance with Fannie Mae guidelines. Jumbo LIBOR ARM loans require one full appraisal report (Fannie Mae Forms 1004, 1025, or 1073) for loan amounts up to $1,000,000 and two full appraisal reports for loan amounts greater than $1,000,000. Jumbo Fixed A Rate loans require one full and one desk review for loan amounts greater than $1,000,000 when the property is a primary residence or second home. Investment properties and co-ops require two full appraisal reports for loan amounts greater than $650,000. The borrower's capacity to repay, creditworthiness, source of funds for down payment and the

> adequacy of the collateral securing the mortgage are evaluated per guidelines stated within the Wachovia Mortgage Corporation online Products and Underwriting Manual.
>
> * * *
>
> Exception loans which are originated outside of stated guidelines are available to customers with demonstrated Wachovia relationships and/or strong compensating factors. Exception loans must be approved by exception officers within Wachovia, GBG or the Wealth Management Group.
>
> *Collateral Evaluation/Appraisers*: All jumbo loan products originated through Wachovia require the full Uniform Residential Appraisal Report (Fannie Mae Form 1004 for single-family properties or Fannie Mae Form 1025 for 2-4 family properties or Fannie Mae Form 1073 for all condominiums).

113. The Morgan Stanley Mortgage Loan Trust 2006-7 Prospectus Supplement listed GreenPoint Mortgage Funding, Inc. ("GreenPoint") as a loan originator accounting for more than ten percent of the loans in the mortgage pool underlying that Issuing Trust, and represented that:

> Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Exceptions to the guidelines are permitted where compensating factors are present. The GreenPoint underwriting guidelines are generally not as strict as Fannie Mae or Freddie Mac.
>
> * * *
>
> In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers the ratio of those amounts to the proposed borrower's monthly gross income. . . .
>
> As part of its evaluation of potential borrowers, GreenPoint generally requires a description of the borrower's income. . . .
>
> * * *
>
> In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. All Appraisal are required to conform to the Uniform Standards of Professional Appraisal Practices adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.

114. The above statements, as set forth in ¶¶107-113, were materially false and misleading when made because they failed to disclose that MSMC and loan originators systematically ignored their stated and traditional underwriting standards during the period of origination; that the underwriting standards actually utilized did not properly evaluate the borrower's credit standing and ability to repay the loan, as represented; exceptions were made to the underwriting standards despite the absence of true compensating factors; and that the appraisals were not conducted in accordance with the loan originators' stated underwriting standards. In addition, the statements failed to disclose that the loans sold to the Issuing Trusts (via the Depositor) did not conform to the requirements of the seller guide.

115. Regarding MSMC's acquisition of loans that are sold to the Depositor and transferred to the Issuing Trusts, the Prospectuses stated:

> MSMC acquires residential mortgage loans through bulk purchases and also through purchases of single loans through MSMC's conduit loan purchase program. The mortgage loans purchased through its conduit program generally conform to the conduit origination standards.
>
> Prior to acquiring any residential mortgage loans, MSMC conducts a review of the related mortgage loan seller that is based upon the credit quality of the selling institution. MSMC's review process may include reviewing select financial information for credit and risk assessment and conducting an underwriting guideline review, senior level management discussion and/or background checks. The scope of the loan due diligence varies based on the credit quality of the mortgage loans.
>
> The underwriting guideline review entails a review of the mortgage loan origination process and systems. In addition, such review may involve a consideration of corporate policy and procedures relating to state and federal predatory lending, origination practices by jurisdiction, historical loan level loss experience, quality control practices, significant litigation and/or material investors.

116. The above statements were materially false and misleading when made because they failed to disclose that loan originators: (i) systematically ignored their stated and traditional underwriting standards and that the underwriting standards actually utilized failed to conform to MSMC's conduit originations standards; and (ii) abandoned their respective corporate policy and procedures relating to origination and quality control practices so that they could increase their loan

origination quantity and the resulting fees obtained. In addition, the statements failed to disclose that MSMC entered into an agreement with subprime lenders, such as New Century, to pay a premium for a steady supply of mortgages, even though most, if not all, of those systematically ignored their stated and pre-established underwriting standards.

117. The Registration Statement and Prospectuses contained the following statement concerning the appraisals performed on the loans underlying the Certificates:

> The adequacy of the mortgaged property as security for the repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to [Fannie Mae] and/or [Freddie Mac]. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon market data analysis of the recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

118. The above statements were materially false and misleading when made because they failed to disclose that the appraisals used to determine the adequacy of the mortgaged property for security for the repayment of the related mortgage loans were not made in accordance with pre-established appraisal procedures and in conformity with USPAP.

119. The Registration Statement and Prospectuses stated that "[n]o Mortgage Loan had a Loan-to-Value Ratio at origination of more than approximately 100.00%."

120. The above statement was materially false and misleading when made because the actual LTV ratio for a number of mortgage loans would have exceeded 100% if the underlying properties were appraised according to pre-established appraisal procedures and in accordance with USPAP, per the definition of "Loan-to-Value Ratio" set forth in the Registration Statement.

121. The Prospectuses represent that the securitization transactions are based on the assumption "that the related mortgage properties provide adequate security for the mortgage loans…." In accordance with that assumption, the Prospectuses presented tabular statistics regarding loan LTV ratios, including "Weighted Average Combined Original LTV" by geographic distribution, property type, document level, occupancy, seasoning (months), and range of credit scores.

122. The above statements, including the tabular statistics, were materially false and misleading when made because they failed to disclose that the LTV ratios would have been higher if the underlying properties were appraised according to pre-established appraisal procedures and in accordance with USPAP, as stated in the Registration Statement and Prospectuses.

123. The Prospectuses represented that the securitization structure of each of the Certificate offerings was structured to include credit enhancement in the form of overcollateralization. Each Prospectus Supplement states a particular amount by which the aggregate stated principal balance of the mortgage loans is greater than the aggregate class principal of the Certificates. For example, the MSML Trust 2006-14SL Prospectus Supplement states:

> On the closing date the aggregate stated principal balance of the mortgage loans is expected to exceed the aggregate class principal of the [offered Series 2006-14SL Mortgage Pass-Through] Certificates by approximately $22,655,168. In other words, it is expected that there will be approximately 6.40% overcollateralization as of the closing date.

124. The above statements were materially false and misleading when made because they failed to disclose that because MSMC paid a premium for a steady supply of mortgages from loan originators such as New Century, that systematically ignored their underwriting standards and abandoned their property appraisal standards, borrowers would not be able to repay their loans, foreclosure sales would not recoup the full value of the loans, and the aggregate expected principal payments would not, nor could they be expected to, exceed the aggregate class principal of the Certificates. As such, the Certificates were not protected with the level of credit enhancement and overcollateralization represented to investors in the Prospectus Supplements.

125. The Prospectuses stated that the mortgage loans held by the Issuing Trusts and underlying the Certificates "are expected to generate more interest than is needed to pay interest on the

[] Certificates and the related expenses of the trust fund because the weighted average interest rate on the mortgage loans is expected to be higher than the weighted average pass-through rate on the [C]ertificates plus the servicing fee."

126. The above statements were materially false and misleading when made because they failed to disclose that because the loan originators systematically ignored their underwriting standards and abandoned their property appraisal standards, borrowers would not be able to repay their loans, foreclosure sales would not recoup the full value of the loans, and the aggregate expected principal payments would not, nor could they be expected to, exceed the aggregate class principal of the Certificates. As such, the Certificates were not protected with the level of credit enhancement and overcollateralization represented to investors in the Prospectus Supplements.

127. The Registration Statement and Prospectuses stated that it was "a condition of the issuance of the Certificates" that they receive respective ratings from the Rating Agency Underwriters, as set forth in the Prospectus Supplements. As stated:

> [T]he ratings assigned to mortgage pass-through certificates address the likelihood of the receipt of all payments on the Mortgage Loans by the Certificateholders under the agreements pursuant to which such certificates are issued. Such ratings take into consideration the credit quality of the Mortgage Loans, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the Mortgage Pool is adequate to make the payments required by such certificates.

128. Each Prospectus Supplement listed the "Initial Ratings of the Certificates" being offered by the Issuing Trust. In each, certain Certificates were rated as investment-grade, in accordance with the pre-established rating systems utilized by the Rating Agency Underwriters. For example, the MSML Trust 2006-14SL Prospectus Supplement included the following chart identifying each Series 2006-14SL Certificate rating:

| Class Offered Certificates | Initial Principal Balance (1) | Pass-Through Rate | Principal Types | Interest Accrual Period/ Delay (2) | Initial Ratings of the Certificates (3) S&P | Moody's |
|---|---|---|---|---|---|---|
| Class A-1 | $234,162,000 | Floating Rate (4), (5) | Senior | 0 day | AAA | Aaa |
| Class M-1 | $ 35,929,000 | Floating Rate (4), (6) | Subordinate | 0 day | AA | Aa2 |
| Class M-2 | $ 6,902,000 | Floating Rate (4), (7) | Subordinate | 0 day | AA- | Aa3 |
| Class M-3 | $ 19,469,000 | Floating Rate (4), (8) | Subordinate | 0 day | A | A2 |
| Class M-4 | $ 6,017,000 | Floating Rate (4), (9) | Subordinate | 0 day | A- | A3 |
| Class B-1 | $ 8,495,000 | Floating Rate (4), (10) | Subordinate | 0 day | BBB+ | Baa1 |
| Class B-2 | $ 5,663,000 | Floating Rate (4), (11) | Subordinate | 0 day | BBB | Baa2 |
| Class B-3 | $ 4,601,000 | Floating Rate (4), (12) | Subordinate | 0 day | BBB- | Baa3 |

129. The above statements, as set forth in ¶¶127 and 128, were false and misleading when made because they (i) failed to disclose that the ratings assigned to the Certificates did not reflect the true likelihood of the receipt of all payments on the loans; (ii) misrepresented that the ratings considered the actual credit quality of the loans; (iii) misrepresented that the ratings considered the extent to which the payment stream on the loans was adequate to make the payments required by the Certificates; and (iv) misrepresented that certain Certificates were "investment-grade" when they should have been classified as below investment-grade, in accordance with the Rating Agency Underwriters' pre-established rating guidelines.

## VIII. CLASS ACTION ALLEGATIONS

130. Plaintiff brings this action pursuant to California Code of Civil Procedure § 382, individually and on behalf of itself and all persons or entities ("plaintiffs" or the "Class") who purchased or otherwise acquired beneficial interests in the assets of the Morgan Stanley Issuing Trusts (as set forth in ¶23) pursuant to or traceable to Morgan Stanley Dean Witter Capital I Inc., f/k/a Morgan Stanley Capital I Inc.'s ("MSC I") March 14, 2006 Registration Statement and accompanying Prospectuses and Prospectus Supplements.

131. This action is properly maintainable as a class action for the following reasons:

a) The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through discovery, plaintiffs believe that there are thousands of members of the proposed Class, who may be identified from records maintained by the Issuing

Defendants and/or may be notified of this action using the form of notice customarily used in securities class actions.

b) Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is adequately representative of the Class and will fairly and adequately protect the interests of the Class.

c) The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

d) A class action is superior to all other methods for a fair and efficient adjudication of this controversy. There will be no difficulty in the management of this action as a class action. Furthermore, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

132. There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member. The common questions include, *inter alia*, the following:

a) Whether defendants violated the Securities Act;

b) Whether statements made by defendants to the investing public in the Registration Statement, Prospectus and Prospectus Supplements both omitted and misrepresented material facts about the mortgages underlying the Issuing Trusts; and

c) The extent and proper measure of the damages sustained by the members of the Class.

## FIRST CAUSE OF ACTION

For Violation of Section 11 of the Securities Act
(Against The Individual Defendants, Issuing Defendants and Underwriter Defendants)

133. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

134. This Cause of Action is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiff and the Class, against the Individual Defendants, the Issuing Defendants and the Underwriter Defendants. This Cause of Action is predicated upon defendants' strict liability for making false and misleading statements in the Offering Documents.

135. The Registration Statement for the Certificate offerings was materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

136. The Individual Defendants, the Issuing Defendants and the Underwriter Defendants are strictly liable to Plaintiff and the Class for making the misstatements and omissions in issuing the Certificates.

137. The Individual Defendants each signed the Registration Statement.

138. The Underwriter Defendants each acted as an underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates. The Underwriter Defendants were underwriters for the respective Issuing Trusts.

139. The Individual Defendants, Issuing Defendants and Underwriter Defendants owed to the Plaintiff and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

140. The Individual Defendants, Issuing Defendants and Underwriter Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

141. Each of the Individual Defendants, Issuing Defendants and Underwriter Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

142. The Individual Defendants, Issuing Defendants and Underwriter Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Prospectuses, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

143. By reason of the conduct alleged herein, each of the Individual Defendants, Issuing Defendants and Underwriter Defendants violated Section 11 of the Securities Act, and is liable to Plaintiff and the Class.

144. Plaintiff and other Class members acquired Certificates pursuant and/or traceable to the Registration Statements. At the time Plaintiff and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

145. Plaintiff and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Individual Defendants, Issuing Defendants and Underwriter Defendants.

146. By virtue of the foregoing, Plaintiff and other Class members are entitled to damages, jointly and severally from each of the Individual Defendants, Issuing Defendants and Underwriter Defendants, as set forth in Section 11 of the Securities Act.

147. This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents, within one year after the Certificates' ratings were downgraded to "junk bonds," and within three years of the Certificates being offered to the public. Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## SECOND CAUSE OF ACTION

For Violation of Section 12(a)(2) of the Securities Act
(Against the Issuing Defendants and Underwriter Defendants)

148. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

149. This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiff and the Class, against the Issuing Defendants and Underwriter Defendants.

150. The Issuing Defendants and Underwriter Defendants promoted and sold Certificates pursuant to the defective Prospectuses for their own financial gain. The Prospectuses contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

151. The Issuing Defendants and Underwriter Defendants owed to Plaintiff and the other Class members who purchased Certificates pursuant to the Prospectuses a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading. The Issuing Defendants and Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectuses, as set forth herein.

152. Plaintiff and other Class members purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Prospectuses. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Prospectuses.

153. By reason of the conduct alleged herein, the Issuing Defendants and Underwriter Defendants violated Section 12(a)(2) of the Securities Act, and are liable to Plaintiff and other Class members who purchased Certificates pursuant to and/or traceable to the Prospectuses.

154. Plaintiff and other Class members were damaged by the Issuing Defendants' and Underwriter Defendants' wrongful conduct. Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section

12(a)(2) of the Securities Act. Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in Section 12(a)(2) of the Securities Act.

155. This action is brought within one year after the discovery of the untrue statements and omissions contained in the Prospectuses, within one year after the Certificates' ratings were downgraded to "junk bonds," and within three years of when the Certificates were sold to the public. Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## THIRD CAUSE OF ACTION

For Violation of Section 15 of the Securities Act
(Against Morgan Stanley, MSMC and MSCo)

156. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

157. This Cause of Action is brought against defendants Morgan Stanley, MSMC and MSCo as controlling persons, pursuant to Section 15 of the Securities Act. Each of Morgan Stanley, MSMC and MSCo, by virtue of its control, ownership, offices, directorship, and specific acts, was at the time of the wrongs alleged herein a controlling person of the Issuing Defendants within the meaning of Section 15 of the Securities Act. Each of Morgan Stanley, MSMC and MSCo had the power and influence, and exercised that power and influence, to cause the Issuing Defendants to engage in violations of the Securities Act, as described herein.

158. Morgan Stanley's, MSMC's and MSCo's control ownership and position made them privy to, and provided them with actual knowledge of, the material facts concealed from Plaintiff and other Class members.

159. By virtue of the wrongful conduct alleged herein, Morgan Stanley, MSMC and MSCo are liable to Plaintiff and other Class members for their sustained damages.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

(a) Declaring this action properly maintainable as a class action pursuant to California Code of Civil Procedure § 382;

(b) Awarding compensatory and/or rescissionary damages in favor of Plaintiff and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other relief as the Court may deem just and proper.

JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 2, 2008

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

David R. Stickney (by TAD)
David R. Stickney

DAVID R. STICKNEY (Bar No. 188574)
TIMOTHY A. DeLANGE (Bar. No. 190768)
BRETT M. MIDDLETON (Bar. No. 199427)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323
davids@blbglaw.com
timothyd@blbglaw.com
brettm@blbglaw.com

POND, GADOW & TYLER
JOHN GADOW
BLAKE TYLER
502 South President Street
Jackson, MS 39201
johngadow@pgtlaw.com
btyler@pgtlaw.com

*Counsel for Plaintiff Public Employees' Retirement System of Mississippi and Proposed Lead Counsel for the Class*

# Superior Court of California
# County of Orange

## CIVIL COMPLEX CENTER

**751 W. Santa Ana, Blvd. Santa Ana, CA 92701**
**PO BOX 22028 92702-2028**

| DEPT | CIVIL JUDGES | NOTICED MOTIONS HEARD | EX PARTES HEARD | TELEPHONIC NOTICE TO COURTROOM NO LATER THAN | EX PARTE APPLICATION PRESENTED IN COURTROOM NO LATER THAN |
|---|---|---|---|---|---|
| CX101 | VELASQUEZ SUPERVISING JUDGE (714) 568 4802 | Thursdays 1:30 P.M. | M - F, 1:30 P.M. | NOON, DAY BEFORE EX PARTE HEARING | 10:00 A.M., DAY OF EX PARTE HEARING |
| CX102 | ANDLER (714) 568 4822 | Thursdays, 1:30 P.M. | M-Th, 9:00 A.M. | 10:00 AM, DAY BEFORE EX PARTE HEARING | 12:00 P.M., DAY BEFORE EX PARTE HEARING; OPPOSITION MUST BE IN WRITING |
| CX103 | BAUER (714) 568 4812 | Mondays, 10:30 A.M. | Tu, Th 1:30 P.M. | NOON, DAY BEFORE EX PARTE HEARING | 10:00 A.M., DAY OF EX PARTE HEARING |
| CX104 | COLAW (714) 568 4818 | Fridays 10:00 A.M. | M, T, W and F, 1:30 P.M. | NOON, DAY BEFORE EX PARTE HEARING | 10:30 A.M., DAY OF EX PARTE HEARING |
| CX105 | SUNDVOLD (714) 568 4807 | Fridays, 9:00 A.M. | M - Th 1:30 P.M. | NOON, DAY BEFORE EX PARTE HEARING | 10:00 A.M., DAY OF EX PARTE HEARING |

## L&M Tentative Rulings are issued. ### L&M Tentative Rulings issued via the Internet.

1. **The fee required for each ex parte application must be paid at the Clerks Office (Room 213). The consideration of ex parte applications shall not interfere with or delay the trial in progress. Requirements pursuant to California Rules of Court (CRC) 3.1200-3.1207 shall apply. All paperwork, including proposed pleadings or motions and orders, must be submitted with ex parte application.**

   **Moving party shall submit on moving papers unless the Court invites oral argument. Moving papers must:**
   - **Include a declaration of Notice of Ex Parte Hearing and a proposed order.**
   - **State in first paragraph of the application the irreparable harm that will occur if the relief requested is not granted until after a formally noticed hearing.**

2. **Information about filing requirements or fees is available on the INTERNET home page:** http://www.occourts.org **or by phone at (714) 568 4700. Orange County Superior Court Local Rules are now available online on the Court's website.**

3. **Moving and responding parties shall be in the department at the appointed time. No check-ins will be received after the appointed time without good cause. There will be no second call.**

4. **Teleconference appearances are conducted in conformity with the guidelines, which are available by calling CourtCall, LLC at (310) 914-7884 or (888) 88-COURT. Teleconference appearance is voluntary and does not require consent of the other attorneys or parties in the case. The Court does, however, reserve the right to reject any request. For information about this program, call CourtCall, LLC, not the courtroom.**

5. **The Complex Litigation Panel requires the filing of a Meet and Confer statement at least 10 calendar days prior to the hearing of any motion, petition or application except discovery motions and Motions to Withdraw as Counsel of Record. *All parties and counsel are expected to comply and be familiar with the Complex Litigation Guidelines and applicable Rules of Court.***

6. **CXC Direct Fax Filing phone number: (714) 568 5180 in accordance with CRC 2.304 and Local Rule 380**

**PLAINTIFF SHALL SERVE A COPY OF THE COMPLEX LITIGATION GUIDELINES WITH THE SUMMONS AND COMPLAINT.**

Rev APRIL 17, 2007

# GUIDELINES - ALL COMPLEX DEPARTMENTS

Welcome to the Complex Civil Litigation Program. Orange County Superior Court is one of six courts designated by the California Judicial Council as pilot project courts to handle solely complex litigation. These pilot courts have been established to test case management principles which may improve the effective administration of justice by reducing the time and expense normally associated with the litigation of complex civil cases. The principles make it easier to prepare these cases for trial by providing a more orderly framework for the pre-trial phase of the litigation. The result is a greater opportunity for early case resolution through mediation and settlement, and improving the way complex cases are tried by encouraging the use of technology. Counsel's familiarity with the applicable California Rules of Court, Orange County Superior Court Rules, and the *Deskbook on the Management of Complex Civil Litigation* ("*Deskbook*") is expected. A copy of the *Deskbook* may be obtained by contacting LEXIS Publishing at (800) 833-9844. These guidelines should answer most procedural questions and assist you in feeling comfortable in our courtrooms. ***These Guidelines are Orders of the Court.***

**PLAINTIFF MUST SERVE A COPY OF THESE GUIDELINES WITH THE SUMMONS AND COMPLAINT**

## I. COURTROOM DEMEANOR, CONDUCT AND ETIQUETTE:

1. The court expects civility and proper decorum at all times in the courtroom. Witnesses and parties, except for small children, are to be addressed and referred to by their surnames. Courtesy toward everyone in the courtroom is required. Advise all witnesses and parties to observe appropriate courtroom demeanor and punctuality. ***The civil and courteous treatment of courtroom staff and opposing counsel is a paramount professional obligation of counsel.***

2. All electronic devices such as pagers and cell phones must be TURNED OFF while in the courtroom whether or not court is in session.

3. Trial attorneys should be in the courtroom 10 minutes prior to the start of court each morning. Punctuality is not only a courtesy to others, it is required. Counsel should expect that the court will take appropriate action if counsel is late for any appearance without good reason.

4. Objections, statements and arguments must be addressed to the court rather than opposing counsel. Counsel may speak from the lectern or the counsel table and may examine witnesses and object without standing or without asking permission.

5. Do not enter the well of the courtroom at any time.

6. Do not lean or sit on the jury rail.

7. Do not approach the clerk or reporter while court is in session for any reason.

8. At the end of each day, counsel must clear work areas including the area in the rear of the courtroom unless granted leave of the court otherwise.

9. Any use of the department's fax machine is permitted only by order of the court.

10. It is counsel's responsibility to record the date and time set for any future hearing. If counsel needs to confirm a hearing date, please call opposing counsel before calling the court. If the information is still not available, please call the Clerk's Office of the Civil Complex Center at (714) 568-4700. Please do not call courtroom staff unless these previously noted resources do not have the information you need.

11. Copy work is done by staff in the Clerk's Office. Courtroom staff will not make copies at counsel's request unless directed to do so by the judge. All copies are subject to a per-page copying fee.

## II. <u>GENERAL MATTERS</u>

1. The court expects all counsel to maintain regular communication with each other regarding hearing dates, the progress of the case, and settlement possibilities.

2. The court believes in liberal discovery but expects counsel to refrain from engaging in excessive and abusive discovery.

3. The court will require written notice of all hearing dates and decisions. Notice is not normally waived and waiver of notice must be stated on the record.

4. Continuances of hearing or trial dates are discouraged but may be necessary from time to time. Continuances of trial or hearing dates by stipulation are not permitted without approval by the court. Even if counsel have stipulated to a continuance, the new date must be pre-approved by the courtroom clerk. Please call the courtroom clerk for available dates before contacting other counsel. Stipulated continuances must be supported by declaration stating the reasons for the continuance and be accompanied by a proposed order for the court's signature. Faxed signatures on stipulations are permitted. All applicable fees apply.

5. Please consult the Orange County Superior Court Rules prior to seeking the assistance of courtroom staff in order to minimize telephone calls to the department.

6. In the event a case settles prior to a court hearing or trial date, the plaintiff or cross-complainant must file in the assigned department either a full dismissal, a Stipulation for Entry of Judgment, or a Judgment on Stipulation that is in a form ready for the judge's signature. If the applicable document is not ready for filing by the time of the next hearing date, counsel must appear at the time scheduled for the hearing and recite the settlement for the record.

7. Cross-complainants must serve a copy of these guidelines and give notice of any scheduled hearings and depositions at the time the cross-complaint is served.

8. Information about filing requirements or fees is available on the court's INTERNET home page at: http://www.occourts.org, or by telephone at (714) 568-4700. **Orange County Superior Court Rules** are available on the court's internet home page.

9. Telephone appearances are conducted pursuant to the provisions of California Rules of Court, Rule 3.670 and the guidelines of CourtCall, available at (310) 342-0888 or (888) 88-COURT.

## III. LAW AND MOTION:

1. **Meet and Confer**: This court adopts the *Deskbook's* view that pre-filing conferences between counsel may be useful in avoiding useless or unnecessary motions (*Deskbook*, Pleading and Motion Practice, § 2.42.). Therefore, prior to the hearing of any motion, petition or application, except applications to appear *pro hac vice* and motions to withdraw as counsel of record, all counsel and parties appearing in *propria persona* shall confer in a good faith attempt to eliminate the necessity of the hearing or resolve as many disputes as possible.

   Counsel for the moving party shall arrange the conference to meet and confer and, at least 10 calendar days before the hearing, file at the Clerk's Office of the Civil Complex Center (Room 213) a statement entitled "Meet and Confer," signed under penalty of perjury, summarizing the issues remaining in dispute and the respective positions taken. Failure to comply with the requirement to meet and confer may result in the matter being continued or taken off calendar.

   If the court finds that there was no good reason for a failure to resolve the dispute, the court may order any person who unreasonably fails to settle any disputed issue to pay the amount of the opposing party's reasonable expenses, including reasonable attorneys' fees incurred in making or opposing the matter.

2. **Off Calendars and Continuances**: In order to promote judicial economy and avoid wasting court resources, counsel for moving parties must notify the court as soon as possible if any matter will be taken off calendar or continued.

## IV. EX PARTE APPLICATIONS:

1. The filing fee for each *ex parte* application must be paid at the Clerk's Office of the Civil Complex Center (Room 213). The court's consideration of an *ex parte* application will not interfere with or delay any trial in progress. The moving party is expected to adhere to the provisions of California Rules of Court, Rule 3.1200 – 3.1207. All papers necessary to the determination of the application, including any proposed pleading, motion or order, must be submitted with the *ex parte* application.

2. The application shall include a declaration of Notice of Ex Parte Hearing and a proposed order; and shall state in the notice the irreparable harm, immediate danger or other basis for *ex parte* relief that will result if the requested relief is not granted until a regularly noticed motion may be heard.

3. The parties shall appear at the appointed time in the department in which the application is to be heard. No late appearance will be heard without good cause. There is no second-call on the *ex parte* calendar.

## V. Referees

1. In complex cases, the court has the authority to 1) appoint a referee to conduct mediation or mandatory settlement conferences, or to hear and determine discovery disputes; 2) order the parties to compensate the referee in a manner which is fair; and 3) compel attendance by the parties and their carriers at mediation and settlement conferences. (Code of Civil Procedure §187, §639 and Lu v. Superior Court (1997) 55 CA.4th 1264, 1270 -72.)

2. It is the court's expectation that all parties and their carriers will appreciate the advantage of cooperating in early settlement or mediation efforts.

3. It is the general order of the court that the provisions of Orange County Superior Court Rule 448 shall apply to mandatory settlement conferences, and that the provisions of subdivisions D., E., H. and I. of Rule 448 shall apply to mediation as if the mediation was a mandatory settlement conference for all parties which have agreed to mediate. However, the referee is authorized to require the attendance of any person at any mediation agreed upon as may be appropriate for the circumstances of the case and the position of each party. For example, "major players" may be required to have a claims representative present, while "minor players" may be allowed to have a claims representative available by telephone during the mediation. Similar appropriate accommodation may be made by the referee for association boards, business entities, or multiple plaintiffs for example. All parties are expected to cooperate in making a sincere effort to resolve the case without a trial.

4. Any request for a waiver of the requirement to personally appear at a mandatory settlement conference, whether conducted by the court or a referee, must be made by written application to the court in accordance with the provisions of Orange County Superior Court Rule 448.I.3(5).

5. No later than 20 days prior to the initial Case Management Conference, the plaintiff is expected to have conferred with all other parties which have filed a responsive pleading concerning whether referee services are appropriate for the case. If the parties agree that the appointment of a referee would benefit the case, counsel shall then attempt to agree on the selection of one or more referees for the purposes stated in this section.

   Plaintiff is expected to propose to all other parties a list of 3 to 6 potential referee candidates after having inquired of each candidate concerning his or her availability to accept an appointment. If a party cannot agree to the appointment of any of the referees suggested by the plaintiff, that party must propose an alternative list of referee candidates. If the parties still cannot agree, a party may apply for the appointment of a referee under the provisions of Code of Civil Procedure §638 or §639, whichever is appropriate, supported by a declaration stating the reasons why the appointment of a referee would benefit the case, and identifying the issue upon which the parties are

unable to agree, including whether there is partial agreement among some of the parties. The names of all of the proposed referee candidates, if any, shall be stated in the declaration.

When all of the parties agree that the appointment of a referee would benefit the case, but cannot agree on the selection of a particular referee, the court may appoint the referee(s) with or without further notice at the Case Management Conference if the court believes the appointment of a referee would benefit the case.

6. The appointed referee(s) may assist with the preparation of the Case Management Order, mediation, discovery schedule, and other pre-trial matters.

## VI. MANDATORY SETTLEMENT CONFERENCES ("MSC"):

No case will be tried before a sincere effort is made to settle. The court expects that the parties will first attempt to settle the case using the assigned mediator or referee, if any. When a mediator or settlement referee has been appointed in the case, a settlement conference through the court will be scheduled only after reasonable attempts to settle with the assistance of the mediator or settlement referee have been exhausted. The court expects the parties will comply with the provisions of Orange County Superior Court Rule 448.

All of the judges at the Civil Complex Center are willing to help another judge in the settlement of a complex case depending upon the judge's available calendar. If the parties agree to have a mandatory settlement conference conducted by a judge other than the assigned judge, the parties should first determine the other judge's availability before asking the assigned judge to order the settlement conference. However, it is not presumed that the judge to whom a case is assigned should not conduct the mandatory settlement conferences in his or her cases. If a party objects to the trial judge's participation in the MSC, the party must advise the judge or the courtroom clerk of its objection prior to the setting of the MSC. **Counsel are advised to check with the court to determine its preference in this regard.**

## VII. CASE MANAGEMENT HEARINGS AND OTHER CONFERENCES:

Case Management Conferences and periodic Status Conferences (in addition to other required appearances) are likely to be scheduled throughout the pendency of the litigation on the court's own motion or at the request of one of the parties. The first Case Management Conference is generally scheduled approximately 90 days after the action is filed. Plaintiff is required to give notice of this conference date to all other parties. The parties should expect the court to schedule review hearings about every 90 days to monitor how the case is progressing.

A Trial Readiness Conference or Pre-trial Conference will likely be scheduled 30-90 days before trial for the purpose of determining the readiness of the parties and resolving procedural issues concerning the trial. The goal of the Trial Readiness Conference or Pre-trial Conference is to make the trial proceed as predictably and smoothly as possible. **The Trial Readiness Conference or Pre-trial Conference is**

**not a substitute for the Issues Conference required by Orange County Superior Court Rule 450.**

## VIII. CASE MANAGEMENT:

1. Case Management Orders are not required in all cases, but they may be helpful in cases where the sequencing and timing of key events are necessary in the management of the litigation and preparation of the case for trial. However, even if a Case Management Order is not necessary in a particular case, *all complex cases must be managed by counsel, or the court, or both.*

   The goal of case management is to "bring about a just resolution as speedily and economically as possible." (*Deskbook*, Case Management, §2.01.) To be effective, case management "should be tailored to the needs of the particular litigation and to the resources available; make-work activity should be avoided." (*Id.*) The parties or the court should develop and monitor an "effective plan for the orderly conduct of pretrial and trial proceedings." (*Deskbook*, Case Management, §2.04.) A case management plan "should prescribe a series of procedural steps, with firm dates, giving direction and order to the case as it progresses through pretrial proceedings to summary disposition or trial." (*Id.*) The setting of interim time limits and deadlines is often a necessary part of an effective case management plan.

2. **Case Management Conference and Status Conference Statements**: The judges of the Civil Complex Center have determined that Judicial Council form CM-110, *Civil Case Management Statement* (required by California Rules of Court, Rule 3.725(c), is *in*adequate to provide the judges the information they need when determining how a particular complex case should be managed. ***Form CM-110 shall not be used in any action designated or provisionally designated as complex.*** Instead, the parties shall file with the court either a Case Management Conference Statement or a Status Conference Statement as described below.

   Counsel must file an updated Conference Statement for *each* Case Management or Status Conference. The Conference Statement is due no later than 5 court days prior to the hearing.

   A Case Management Conference Statement is a comprehensive report of the case which should include a brief objective summary of the case, the potential dimensions of the case, significant procedural and practical problems which may likely be encountered in the case, suggestions for efficient management of the case, including a proposed time-line of key events in the case or a proposed case management order, if appropriate, and any other special consideration the court should be made aware of to assist it in determining an effective case management plan.

   A Status Conference Statement may be filed as an alternative to the Case Management Conference Statement when appropriate. A Status Conference Statement is generally less detailed than a Case Management Conference Statement and is to be used to advise the court of progress or developments in the case which have occurred since the last review hearing.

A joint statement of the parties is preferred by the court whenever possible.

3. **Early resolution of threshold issue**: On occasion, the progress of a case can be helped by the early resolution of a pivotal or threshold issue upon which the rest of the case hinges. However, when the resolution of such an issue depends upon the determination of questions of fact, a definitive outcome may not be readily achievable through a motion, such as a motion for summary judgment. In such cases, if the parties are willing to enter necessary stipulations to allow for a separate trial of a limited issue, the court will order the trial solely on that issue as soon as the parties can be ready.

   In such a trial, the preponderance of the evidence standard is presumed to be the burden of proof unless the law requires otherwise. (Evidence Code §115.) As with any trial, the outcome is binding on the parties even though the findings are interlocutory. Where the parties seek a jury trial of the issue, the court is likely to require a stipulation by the parties that the issue may be heard and determined by a jury different from that which will hear and determine the remaining issues in the case.

## IX. <u>TRIALS</u>:

1. **Motions *in limine***: Motions *in limine*, including pretrial hearings under Evidence Code §402, must be in writing and supported by a memorandum of points and authorities. Motions *in limine* shall be exchanged at the Issues Conference pursuant to Orange County Superior Court Rule 450. Motions and oppositions to the motions shall be filed on the Friday before the trial date in the department in which the trial is set.

   Pre-trial motions to preclude evidence at trial shall specify the evidence the moving party seeks to exclude and shall be supported by a declaration stating (1) the specific ground of the objection; (2) the reasons why the moving party believes the evidence will likely be offered at trial; and (3) a sufficient offer of proof to permit the court the ability to determine the admissibility of the evidence on the objection specified. (See Evidence Code §353.)

   Counsel should keep in mind it may be difficult for him or her to specify the evidence which is the subject of the motion, and the precise grounds on which it should be precluded, until that evidence is offered. "Actual testimony sometimes defies pretrial predictions of what a witness will say on the stand. Events in the trial may change the context in which the evidence is offered to an extent that a renewed objection is necessary to satisfy the language and purpose of Evidence Code section 353." (<u>Kelly v. New West Federal Savings</u> (1996) 49 CA 4th 659, 671.) "'Until the evidence is actually offered, and the court is aware of its relevance in context, its probative value, and its potential for prejudice, matters related to the state of the evidence at the time an objection is made, the court cannot intelligently rule on admissibility.'" (*Id.*)

   Counsel should attempt to resolve evidentiary disputes at the Issues Conference before resorting to a motion *in limine*. "It is frequently more productive of court time, and the client's money," for counsel to informally address at the Issues Conference the issues which could be raised in motions *in limine* and, instead of a motion, present a stipulation to the court on uncontested issues. Matters of day-to-day trial logistics and common

professional courtesy should not be the subject of motions *in limine*. These are matters of common professional courtesy that should be accorded counsel in all trials.

2. Jury Trial:

   A. Procedural matters and issues relating to jury selection most often can be addressed orally and informally with the court, and later preserved on the record if necessary.

   B. Parties shall use CACI instructions when applicable. Proposed jury instructions shall be filed in typed form on the Friday before the trial date. A modified version of a CACI instruction should be plainly marked as "Modified." Handwritten modification of a standard CACI instruction is acceptable with court approval. CACI instructions shall be submitted to the court using the "masthead" format, with spaces to indicate which party has submitted the instruction, and whether the instruction will be given, given as modified, withdrawn or refused. The court has the discretion whether to provide multiple sets of instructions to the jury for its deliberation.

   C. At the Issues Conference, counsel should discuss stipulating to less than 12 jurors to try the case in the event the jury is reduced to less than 12 jurors prior to verdict.

   D. All challenges for cause shall be made outside the hearing of the jury panel.

   E. Objections during the course of the trial shall be in the form of a concise statement of the grounds. Speaking objections are not permitted. Argument on the objection without invitation by the court is not permitted.

   F. Counsel shall neither make reference to nor display charts, models, photographs or other demonstrative evidence to the jury unless: 1) the evidence has been received into evidence; 2) opposing counsel has been given the opportunity to review the evidence and has no objection to it; or 3) the proponent of the evidence has leave of court to refer to or display the evidence.

3. In a court trial, trial briefs must be exchanged at the Issues Conference pursuant to Orange County Superior Court Rule 450, and filed with the court on the Friday before the date set for trial, unless the court has granted leave otherwise.

4. On the first day of trial, counsel shall deposit with the courtroom clerk a blank check to cover the anticipated jury/reporter fees. Payment of the actual amount of jury/reporter fees is required at the end of each week of trial. Counsel may be required to deposit a new blank check at the beginning of each successive week of trial.

## X. TRIAL EXHIBITS:

### 1. INTRODUCTION:

A. At the Trial Readiness Conference or Pre-trial Conference counsel should be prepared to state whether his or her client will be using the electronic presentation of evidence at the trial. Using electronic equipment to present evidence at trial requires preparation, organization and cooperation by the parties. The court expects that the parties will work together in devising a protocol for the pre-marking of exhibits by using prefixes or a super-numeration system to designate the proponent of the evidence. (For example, exhibits offered by Acme Air Conditioning may be marked using a prefix system starting at "AAC-0001." Zenith Concrete would mark its exhibits starting at "ZC-0001." Under a super-numeration system, plaintiff would reserve exhibit numbers 1 through 999; defendant would be assigned exhibit numbers 1000 through 1999, and cross-defendant would be assigned exhibit numbers 2000 through 2999 for example.)

B. In a case where it is reasonable to presume voluminous documents will be produced during discovery, counsel are urged to agree upon a protocol for the pre-marking of exhibits at the earliest time possible, preferably before the initiation of discovery and delivery to a document depository. It is less expensive to mark and index voluminous documents as they are deposited than when it is done on the eve of trial.

C. Counsel is required to cooperate throughout the trial so that one party's electronic exhibits are available to the other side to display during cross-examination.

D. The electronic version of documents, photographs, charts or other demonstrative evidence may be substituted for the actual exhibit at trial upon the stipulation of the parties and order of the court. This guideline is not meant to alter the rules of discovery or the obligation of a party to make available the original of a document for inspection by another party through discovery or at the Issues Conference.

E. Physical exhibits and documents are not required to be presented in a digitalized format. However, evidence which has not been presented in electronic form customarily will be ordered by the court returned at the end of the appeal period to the party which offered it. Before trial commences, counsel will be asked to sign a stipulation for the return and maintenance of the exhibits. Plaintiff will maintain joint exhibits unless the court orders otherwise.

F. At the beginning of the trial, counsel shall provide the courtroom clerk a JOINT EXHIBIT LIST describing and numbering each exhibit. The exhibit list shall indicate the exhibits which are to be admitted by stipulation of the parties. Exhibits admitted pursuant to stipulation are deemed admitted at the commencement of the trial. It will greatly assist the courtroom clerk if counsel

also pre-tag and mark for identification the exhibits which will likely be offered at the trial.

A sheet of exhibit tags can be found at the end of these guidelines for counsel to reproduce. They are also available from the courtroom clerk.

2. USE OF ELECTRONIC EVIDENCE PRESENTATION SYSTEMS:

A. Counsel are encourage to take advantage of the benefits of the electronic presentation of evidence when in trial at the Civil Complex Center to enhance the orderly and effective presentation of evidence, reduce concerns about the custody and security of exhibits, and reduce the work and expense associated with the tagging, storing and transporting of exhibits. In an appropriate case, the court may require the use of the electronic evidence presentation system available at the Civil Complex Center as part of the Judicial Council's pilot complex litigation program. Whenever the electronic presentation system of the court is used, the parties are required to utilize the court's sole vendor (DOAR) unless otherwise approved by the court. Whenever evidence is presented electronically, the physical custody of exhibits by the clerk is replaced by the electronic record of the exhibits.

B. Electronic Evidence Standard Format: Counsel must submit to the clerk 2 sets of electronic evidence in PDF file format and stored on CD-R. Evidence must be in sequential order with the exception of JPEG and MPEG files which shall be stored on separate discs. Counsel may also prepare electronic evidence using alternate non-proprietary formats subject to the approval of the court. The compact discs (CD's) must be labeled as follows:

Case #
Case Name
Exhibits ____ to ____
(Original or Backup copy)

C. The courtroom clerk will maintain and provide counsel an updated exhibit list. The clerk must confer with counsel on an ongoing basis to maintain accuracy and completeness of the exhibits. The court may require counsel to periodically submit to the clerk an up-to-date CD containing exhibits received into evidence.

D. It is counsels' responsibility to identify and track redactions, modifications, and substitution of exhibits. Counsel are expected to be prepared to submit an up-to-date evidence CD with all redactions, modifications, and substitutions, as well as impeachment documents used, upon the courtroom clerk's request.

E. Impeachment exhibits are not pre-marked. However, counsel are responsible for having the document electronically recorded upon being offered into evidence (exhibit numbers may be reserved for this purpose). Counsel must consult with the clerk and submit the evidence CD containing the impeachment documents

along with a separate exhibit list in a sealed envelope prior to the time the evidence is offered. The envelope shall be marked "impeachment documents" and identified with the name of the proffering party.

F. Counsel must confer with the clerk, prior to submission of the evidence CD to the jury for use in deliberations, and submit the final joint exhibit list containing only those exhibits received into evidence. The CD used by the jurors must include the joint exhibit list and the electronically stored exhibits which have been entered into evidence. Submission of the joint evidence CD also serves as a stipulation that all exhibits presented in electronic form to the jury are complete and correct. Any disagreement must be brought to the attention of the court at the earliest reasonable time. Counsel must lodge two (2) evidence CDs of all exhibits received into evidence.

G. The jury room will have a PC to view the exhibits on the monitor. The clerk may print copies from the evidence CD for the jurors to use, if requested by the jury. The clerk will collect and destroy copies of exhibits at the conclusion of trial.

3. NON-ELECTRONICALLY PRESENTED EVIDENCE:

A. Counsel must provide an original set plus a copy set of all documentary exhibits. Each set must be pre-marked and tagged using the court approved exhibit tags. Alternatively, counsel may provide one original set plus a copy set in electronic form. The second set is for the judge's use during trial. If counsel intends to use A document for impeachment, two copies of the document must be delivered to the courtroom clerk at the same time in a sealed envelope marked "impeachment documents" and the name of the party. Any alternative to these procedures for the submission of evidence must be presented to the court at the Trial Readiness Conference or Pre-trial Conference.

B. Enlargements and transparencies customarily will not be admitted into evidence unless ordered by the court. Any large exhibit or transparency should be accompanied by an 8 ½" x 11" version of the exhibit similarly marked for identification.

C. Counsel are expected to comply with the provisions of Evidence Code §768(b) by showing the exhibit to the opposing counsel before it is displayed to the trier of fact.

D. Interrogatories and Requests for Admission which are expected to be used at trial must be extracted and lodged with the court, and a copy given to counsel, at the appropriate time. In jury trials, questions and answers must be read into the record, subject to proper objections. The extracts may be submitted as exhibits in bench trials.

## XI. USE OF DEPOSITION TRANSCRIPTS

Deposition transcripts which are expected to be used at trial must be lodged with the Court on the first day of trial. Portions of a deposition transcript offered into evidence must be read into the record as if live testimony, subject to proper objections.

## JOINT EXHIBIT LIST

**Case Name:** ______________________

**Case No:** ____________

**Dept :** ____________ **Type of Hearing :** ____________

| [illegible] | [illegible] | ID | [illegible] | DESCRIPTION |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**EXHIBIT NO.**

☐ ID only (Date)

☐ **IN EVIDENCE** (Date)

☐ Plaintiff/People ☐ Defendant ☐ Joint
☐ Petitioner ☐ Respondent ☐ Court
☐ (Other)

Atty/Party Introducing Sensitive Exhibit

Case No.

Vs.

Alan Slater, Executive Officer and Clerk

Deputy

**NOTE: THIS ITEM IS A PERMANENT COURT RECORD. DO NOT REMOVE FROM THE COURTROOM**

**EXHIBIT NO.**

☐ ID only (Date)

☐ **IN EVIDENCE** (Date)

☐ Plaintiff/People ☐ Defendant ☐ Joint
☐ Petitioner ☐ Respondent ☐ Court
☐ (Other)

Atty/Party Introducing Sensitive Exhibit

Case No.

Vs.

Alan Slater, Executive Officer and Clerk

Deputy

**NOTE: THIS ITEM IS A PERMANENT COURT RECORD. DO NOT REMOVE FROM THE COURTROOM**

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE
American Home Mortgage Claims Processing Center
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re: American Home Mortgage Holdings, Inc., et al. Debtors. | Chapter 11 Case No. 07-11047 (CSS) Jointly Administered |
|---|---|
| Name of Debtor Against Which Claim is Held: American Home Mortgage Corp. | Case No. of Debtor: 07-11051 |

**NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.**

THIS SPACE IS FOR COURT USE ONLY

**Name and address of Creditor : (and name and address where notices should be sent if different from Creditor)**

Creditor:
Morgan Stanley Mortgage Capital Holdings LLC
c/o Morgan Stanley Legal and Compliance Division
1633 Broadway
New York, NY 10019
Attn: Daniela Levarda, Esq.
(212) 537-1518
Daniela.Levarda@MorganStanley.com

With a copy to:
Sidley Austin LLP
787 Seventh Ave.
New York, NY 10019
Attn: Lee Attanasio, Esq.
(212) 839-5300
lattanasio@sidley.com

**Telephone number:**
**Email Address:**

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

**Account or other number by which creditor identifies debtor:**
N/A

**Check here if this claim:**
☐ replaces ☐ amends a previously filed claim, dated:________

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☑ Other Mortgage Loan Sale Agreement (explain)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)

Last Four Digits of your SS#: ____ ____ ____ ____
Unpaid compensation for services performed
from ____________ (date) to ____________ (date)

**2. Date debt was incurred:**
See attached rider.

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $ Contingent, unliquidated (unsecured nonpriority) + ________ (secured) + ________ (unsecured priority) = $ Contingent, unliquidated (Total)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate ☐ Motor Vehicle
☐ Other ____________
Value of Collateral: $____________
Amount of arrearage and other charges at time case filed included in secured claim, if any: $____________

**6. Unsecured Nonpriority Claim:** $ Contingent, unliquidated
☑ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $____________
Specify the priority of the claim:
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(1).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

8. **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

9. **Supporting Documents:** *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.
**DO NOT SEND ORIGINAL DOCUMENTS.** If the documents are not available, explain. If the documents are voluminous, attach a summary.

10 Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

FILED / RECEIVED
JAN 11 200?
EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|
| 01/11/2008 | Van Cushny, Vice President [signature] |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Exhibit B

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re<br><br>American Home Mortgage Corp.<br><br>Debtor. | : | Chapter 11<br><br>Case No. 07-11051 (CSS) |

## RIDER TO PROOF OF CLAIM OF MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC

A. **Debtor**

1. On August 6, 2007 (the "Petition Date"), American Home Mortgage Corporation (the "Debtor" or "AHM Corp.") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Prior to its chapter 11 filing, the Debtor's business primarily entailed the origination, servicing and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans.

B. **Claimant**

2. The claimant is Morgan Stanley Mortgage Capital Holdings LLC ("Morgan Stanley"), successor-in-interest by merger to Morgan Stanley Mortgage Capital Inc. ("MSMCI"), and a New York limited liability corporation. Morgan Stanley files this claim (the "Claim") as a creditor of the Debtor.

C. **Basis for Claim**

3. Morgan Stanley asserts a contingent, unliquidated Claim against AHM Corp. for any amounts related to any potential obligations that may arise under the following mortgage loan purchase agreements:

a. Mortgage Loan Sale and Servicing Agreement, dated as of January 1, 2006, among MSMCI, American Home Mortgage Servicing, Inc. ("AHM Servicing"), as servicer, and AHM Corp. (the "Retained Purchase Agreement");

b. Second Amended and Restated Mortgage Loan Purchase and Warranties Agreement, dated as of December 1, 2005, between MSMCI and AHM Corp. (the "Second Amended Purchase Agreement"); and

c. Third Amended and Restated Mortgage Loan Purchase and Warranties Agreement, dated as of June 1, 2006, between MSMCI and AHM Corp. (the "Third Amended Purchase Agreement", and with the Second Amended Purchase Agreement, the "Released Purchase Agreements");

(a. – c., collectively, the "Agreements").[1] Copies of the Agreements are too voluminous to attach, but will be provided to the Debtor upon request.

4. On or about January 1, 2006, Morgan Stanley entered into the Retained Purchase Agreement with AHM Corp. and AHM Servicing. Pursuant to the Retained Purchase Agreement, Morgan Stanley purchased, from time to time, certain mortgage loans from AHM Corp. on a servicing retained basis. AHM Servicing acted as the servicer of those mortgage loans.

5. On or about December 1, 2005, Morgan Stanley entered into the Second Amended Purchase Agreement with AHM Corp. On or about June 1, 2006, Morgan Stanley entered into the Third Amended Purchase Agreement with AHM Corp. Pursuant to the Released Purchase Agreements, Morgan Stanley purchased, from time to time, certain mortgage loans

[1] Morgan Stanley files this Claim in order to preserve any and all claims related to the Agreements. Morgan Stanley nonetheless reserves all rights to assert that such claims are entitled to administrative priority, and will file the appropriate papers on or before the administrative bar date.

from AHM Corp. on a servicing released basis, although Morgan Stanley hired AHM Servicing to interim service these mortgage loans for a maximum of 90 days following the related purchase.

6. Morgan Stanley still owns certain of the mortgage loans. Other mortgage loans were sold by Morgan Stanley into securitizations or to third parties. When Morgan Stanley sold certain of the mortgage loans into the securitizations or to third parties, Morgan Stanley made certain representations and warranties with respect to those mortgage loans as of the applicable sale date. To the extent such mortgage loans sustain any breaches of representations and warranties as described below, Morgan Stanley is obligated to repurchase the affected mortgage loans and will once again be the owner of such mortgage loans.

D. **Nature and Amount of Claim**

**Early Payment Defaults**

7. Pursuant to the Agreements, and upon notice, AHM Corp. is required to repurchase mortgage loans from Morgan Stanley in circumstances where a mortgagor is "delinquent" in the payment of any of the first three (3) scheduled monthly payments of principal and interest on a mortgage loan either (i) after origination of the mortgage loan; or (ii) after Morgan Stanley's purchase of the mortgage loan (in each case, an "Early Payment Default"). See Retained Purchase Agreement, § 7.04; Released Purchase Agreements, § 9.04. AHM Corp. is required to repurchase such mortgage loans at the price set out in the Agreement under which the specific mortgage loan was purchased (the "Repurchase Price"),[2] which is generally equal to the sum of (i) the purchase price paid by Morgan Stanley, less any amounts received by Morgan

[2] Certain sale-specific terms, including the Repurchase Price and the Premium Purchase Price (as defined below), have been incorporated into the Agreements through Purchase Price and Terms Agreements. Due to the confidential nature of the Purchase Price and Terms Agreements, they have not been attached hereto. The Debtor, as a party to the Purchase Price and Terms Agreements, should already have a copy of such agreements in its possession.

Stanley from or on behalf of the related mortgagor, (ii) accrued interest on such mortgage loan at the applicable mortgage interest rate from the date to which interest had last been paid through the date of such repurchase, (iii) the amount of any outstanding advances owed to the Morgan Stanley and (iv) all costs and expenses incurred by the Purchaser or any servicer arising out of or based upon such breach, including without limitation, costs and expenses incurred in the enforcement of AHM Corp.'s repurchase obligation. Id.

8. In light of these repurchase obligations, Morgan Stanley asserts a contingent, unliquidated Claim for any Early Payment Defaults that may be discovered by Morgan Stanley subsequent to the date hereof.

**Premium Recapture**

9. Morgan Stanley purchased many of the mortgage loans from AHM Corp. at a "premium" under the Agreements. In other words, Morgan Stanley paid in excess of 100% of the respective current principal balances of these mortgage loans. Pursuant to the Agreements, AHM Corp. is obligated to reimburse Morgan Stanley for the premium portion of the purchase price paid on any mortgage loan that is prepaid in full within three (3) months of Morgan Stanley's purchase of the mortgage loan. See Retained Purchase Agreement, § 7.05; Released Purchase Agreements, § 9.05. For each such mortgage loan, AHM Corp. is required to pay Morgan Stanley an amount equal to the excess of the percentage paid over 100% set out in the Agreement under which such mortgage loan was purchased, multiplied by the outstanding principal balance of such mortgage loan at the time of Morgan Stanley's purchase (the "Premium Purchase Price"). Id.

10. In light of AHM Corp.'s obligation to reimburse Morgan Stanley for Premium Purchase Price amounts, Morgan Stanley asserts a contingent, unliquidated Claim for any such amounts that may be discovered by Morgan Stanley subsequent to the date hereof.

**Loan Level Representations and Warranties**

11. At the time Morgan Stanley purchased each mortgage loan from AHM Corp., AHM Corp. made certain representations and warranties regarding the mortgage loan, the related mortgagor, and the related mortgaged property. See Retained Purchase Agreement, § 7.01; Released Purchase Agreements, § 9.02. Pursuant to the Agreements, AHM Corp. is required to repurchase mortgage loans from Morgan Stanley at the Repurchase Price in circumstances where AHM Corp. breaches any of the representations and warranties made in those Agreements. See Retained Purchase Agreement, §§ 7.01-7.03; Released Purchase Agreements, §§ 9.01-9.03.

12. Morgan Stanley therefore asserts a contingent, unliquidated Claim for repurchase obligations that result from a breach of a representation or warranty made in the Agreements that may be discovered by Morgan Stanley subsequent to the date hereof.

**Additional Claims**

13. AHM Corp. is obligated to indemnify Morgan Stanley against any losses, damages, legal fees and costs relating to a breach by AHM Corp. of any of the representations, warranties and covenants set forth in the Agreements. Such losses, damages, fees and costs include, but are not limited to, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and other costs and expenses (including servicing fees, in the case of the mortgage loans purchased under the Released Agreements) associated with the mortgage loans, and interest accumulated on the unpaid balance of the mortgage loans. See Retained Purchase Agreement, §§ 6.03, 7.03, 12.01, 15, 34.07; Released Purchase Agreements, §§ 9.03, 13, 15.01, 36.04.

14. In light of these obligations, Morgan Stanley asserts a contingent, unliquidated Claim for any such indemnifiable amounts relating to a breach of a representation,

warranty or covenant made in the Agreements that may be discovered by Morgan Stanley subsequent to the date hereof.

E. **Reservation of Rights**

15. Morgan Stanley reserves its rights to (a) amend, update and/or supplement this Claim at any time and in any respect,[3] (b) file additional proofs of claim for additional claims that may be based on the same or additional documents or other liability or indebtedness of the Debtor to Morgan Stanley, (c) file a request for payment of administrative expenses in accordance with 11 U.S.C. §§ 503 and 507 including, without limitation, for expenses included in this Claim, and/or (d) to assert a right of recoupment and/or a right of setoff pursuant to 11 U.S.C. § 553 with respect to any claims described herein.

16. The filing of this Claim is not: (a) a waiver or release of Morgan Stanley's rights against any person, entity or property, (b) a consent by Morgan Stanley to the jurisdiction of the Bankruptcy Court with respect to the subject matter of this Claim, any objection hereto, or any other proceeding commenced in this case against or otherwise involving Morgan Stanley, (c) a waiver of the right to move to withdraw the reference, or otherwise to challenge the jurisdiction of the Bankruptcy Court, with respect to the subject matter of this Claim, any objection hereto, or any other proceeding commenced in this case against or otherwise involving Morgan Stanley, or to assert that the reference has already been withdrawn with respect to the subject matter of this Claim, any objection hereto, or any other proceeding commenced in this case against or

[3] This includes, but is not limited to, any claims that may arise in circumstances where Morgan Stanley determines or is required to repurchase any mortgage loans that have been sold by MSMCI or Morgan Stanley into securitizations. This further includes, but is not limited to, any claims that may arise from the Debtor's failure to comply with any term of the Stipulation and Agreement Between the Debtors and Morgan Stanley Mortgage Capital Holdings LLC (the "Stipulation"), which was approved by the Bankruptcy Court on August 24, 2007. Although Morgan Stanley believes that any claim related to the Stipulation would be entitled to administrative priority, out of an abundance of caution, Morgan Stanley reserves the right to amend, update and/or supplement this Claim to include any such claim.

otherwise involving Morgan Stanley, (d) an election of remedy, or (e) a waiver of any past, present or future defaults or events of defaults.

F. **Notices**

All notices with respect to this Claim should be sent to:

Morgan Stanley
1585 Broadway
New York, NY 10019
Attn: Daniela Levarda, Esq.

– and –

Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
Attn: Lee S. Attanasio, Esq.

# EXHIBIT C

**EXECUTION COPY**

---

THIRD AMENDED AND RESTATED MORTGAGE LOAN
PURCHASE AND WARRANTIES AGREEMENT

---

MORGAN STANLEY MORTGAGE CAPITAL INC.,

Purchaser

AMERICAN HOME MORTGAGE CORP.,

Seller

---

Dated as of June 1, 2006

Conventional,
Fixed and Adjustable Rate
Residential Mortgage Loans

---

USActive 3939763.7

SECTION 13. COOPERATION OF SELLER WITH A RECONSTITUTION

The Seller and the Purchaser agree that with respect to some or all of the Mortgage Loans, after the related Closing Date, on one or more dates (each, a "Reconstitution

Date") at the Purchaser's sole option, the Purchaser may effect a sale (each, a "Reconstitution") of some or all of the Mortgage Loans then subject to this Agreement, without recourse, to:

(i) Fannie Mae under its Cash Purchase Program or MBS Program (Special Servicing Option) (each, a "Fannie Mae Transfer"); or

(ii) Freddie Mac (the "Freddie Mac Transfer"); or

(iii) one or more third party purchasers in one or more Whole Loan Transfers; or

(iv) one or more trusts or other entities to be formed as part of one or more Securitization Transactions.

The Seller agrees to execute in connection with any Agency Transfer, any and all pool purchase contracts, and/or agreements reasonably acceptable to the Seller among the Purchaser, the Seller, Fannie Mae or Freddie Mac (as the case may be) and any servicer in connection with a Whole Loan Transfer, a seller's warranties and servicing agreement or a participation and servicing agreement in form and substance reasonably acceptable to the parties, and in connection with a Securitization Transaction, a pooling and servicing agreement in form and substance reasonably acceptable to the parties (collectively, the agreements referred to herein are designated the "Reconstitution Agreements").

With respect to each Whole Loan Transfer and each Securitization Transaction entered into by the Purchaser, the Seller agrees (1) to cooperate fully with the Purchaser and any prospective purchaser with respect to all reasonable requests and due diligence procedures; (2) to execute, deliver and perform all Reconstitution Agreements required by the Purchaser; and (3) to restate the representations and warranties set forth in Subsections 9.01 and 9.02 as of the settlement or closing date in connection with such Reconstitution (each, a "Reconstitution Date") or make the representations and warranties set forth in the related selling/servicing guide of the servicer or issuer, as the case may be, or such representations or warranties as may be required by any rating agency or prospective purchaser of the related securities or such Mortgage Loans in connection with such Reconstitution. The Seller shall provide to such servicer or issuer, as the case may be, and any other participants or purchasers in such Reconstitution: (i) any and all information and appropriate verification of information which may be reasonably available to the Seller or its affiliates, whether through letters of its auditors and counsel or otherwise, as the Purchaser or any such other participant shall request; (ii) such additional representations, warranties, covenants, opinions of counsel, letters from auditors, and certificates of public officials or officers of the Seller or the Interim Servicer as are reasonably believed necessary by the Purchaser or any such other participant; and (iii) to execute, deliver and satisfy all conditions set forth in any indemnity agreement required by the Purchaser or any such participant, including, without limitation, an Indemnification and Contribution Agreement in substantially the form attached hereto as Exhibit B. Moreover, the Seller agrees to cooperate with all reasonable requests made by the Purchaser to effect such Reconstitution Agreements. The Seller shall indemnify the Purchaser, each affiliate of the Purchaser participating in the Reconstitution and each Person who controls the Purchaser or such affiliate and their respective present and former directors, officers, employees and agents, and hold each of them harmless from and

against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that each of them may sustain arising out of or based upon any untrue statement or alleged untrue statement of a material fact contained in the information provided by or on behalf of the Seller regarding the Seller (or if the Seller is not the originator, the originator of the Mortgage Loans), the Seller's servicing practices or performance, the Mortgage Loans or the Underwriting Guidelines set forth in any offering document prepared in connection with any Reconstitution. For purposes of the previous sentence, "Purchaser" shall mean the Person then acting as the Purchaser under this Agreement and any and all Persons who previously were "Purchasers" under this Agreement.

In the event the Purchaser has elected to have the Seller or the Interim Servicer hold record title to the Mortgages, prior to the Reconstitution Date, the Seller shall prepare an assignment of mortgage in blank or to the prospective purchaser or trustee, as applicable, from the Seller or the Interim Servicer, as applicable, acceptable to the prospective purchaser or trustee, as applicable, for each Mortgage Loan that is part of the Reconstitution and shall pay all preparation and recording costs associated therewith. In connection with the Reconstitution, the Seller shall execute or shall cause the Interim Servicer to execute each assignment of mortgage, track such Assignments of Mortgage to ensure they have been recorded and deliver them as required by the prospective purchaser or trustee, as applicable, upon the Seller's receipt thereof. Additionally, the Seller shall prepare and execute or shall cause the Interim Servicer to execute, at the direction of the Purchaser, any note endorsement in connection with any and all seller/servicer agreements.

All Mortgage Loans not sold or transferred pursuant to a Reconstitution shall remain subject to this Agreement and, if the Interim Servicing Agreement shall remain in effect with respect to the related Mortgage Loan Package, shall continue to be serviced in accordance with the terms of this Agreement and the Interim Servicing Agreement and with respect thereto this Agreement shall remain in full force and effect.

SECTION 14. [RESERVED]

SECTION 15. THE SELLER

Subsection 15.01 Additional Indemnification by the Seller; Third Party Claims

(a) The Seller shall indemnify the Purchaser and its present and former directors, officers, employees and agents and the Successor Servicer and its present and former directors, officers, employees and agents, and hold such parties harmless against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable legal fees and expenses (including reasonable legal fees and expenses incurred in connection with the enforcement of the Seller's indemnification obligation under this Subsection 15.01) and related costs, judgments, and any other reasonable costs, fees and expenses that such parties may sustain related to the failure of the Seller to perform its duties in strict compliance with the terms of this Agreement or any Reconstitution Agreement entered into pursuant to Section 13 or any breach of any of Seller's representations, warranties and covenants set forth in this Agreement. For purposes of

this paragraph "Purchaser" shall mean the Person then acting as the Purchaser under this Agreement and any and all Persons who previously were "Purchasers" under this Agreement and "Successor Servicer" shall mean any Person designated as the Successor Servicer pursuant to this Agreement and any and all Persons who previously were "Successor Servicers" pursuant to this Agreement.

(b) Promptly after receipt by an indemnified party under this Subsection 15.01 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Subsection 15.01, notify the indemnifying party in writing of the commencement thereof; but the omission so to notify the indemnifying party will not relieve the indemnifying party from any liability which it may have to any indemnified party under this Subsection 15.01, except to the extent that it has been prejudiced in any material respect, or from any liability which it may have, otherwise than under this Subsection 15.01. In case any such action is brought against any indemnified party and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled to participate therein, and to the extent that it may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party; provided that if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party or parties shall have reasonably concluded that there may be legal defenses available to it or them and/or other indemnified parties which are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties. Upon receipt of notice from the indemnifying party to such indemnified party of its election so to assume the defense of such action and approval by the indemnified party of counsel, the indemnifying party will not be liable to such indemnified party for expenses incurred by the indemnified party in connection with the defense thereof unless (i) the indemnified party shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the indemnifying party shall not be liable for the expenses of more than one separate counsel (together with one local counsel, if applicable)), (ii) the indemnifying party shall not have employed counsel reasonably satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of commencement of the action or (iii) the indemnifying party has authorized in writing the employment of counsel for the indemnified party at the expense of the indemnifying party; and except that, if clause (i) or (iii) is applicable, such liability shall be only in respect of the counsel referred to in such clause (i) or (iii).

Subsection 15.02 Merger or Consolidation of the Seller

The Seller will keep in full effect its existence, rights and franchises as a corporation under the laws of the state of its incorporation except as permitted herein, and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, or any of the Mortgage Loans and to perform its duties under this Agreement.

Any Person into which the Seller may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Seller shall be a party, or any Person succeeding to the business of the Seller, shall be the successor of the Seller hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; *provided, however*, that the successor or surviving Person shall have a net worth of at least $25,000,000.

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

MORGAN STANLEY MORTGAGE CAPITAL INC.

By: ______________________
Name:
Title:

AMERICAN HOME MORTGAGE CORP.

By: ______________________
Name:
Title:

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

MORGAN STANLEY MORTGAGE
CAPITAL INC.

By:________________________
Name:
Title:

AMERICAN HOME MORTGAGE CORP.

By:________________________
Name: Robert F. Johnson
Title: Executive Vice President

**EXHIBIT B**

**FORM OF INDEMNIFICATION AND CONTRIBUTION AGREEMENT**

This INDEMNIFICATION AND CONTRIBUTION AGREEMENT ("Agreement"), dated as of [______], 200_, among [______________] (the "Depositor"), a [______________] corporation (the "Depositor"), Morgan Stanley Mortgage Capital Inc., a New York corporation ("Morgan") and [______________], a [______________] (the "Seller").

W I T N E S S E T H:

WHEREAS, the Depositor is acting as depositor and registrant with respect to the Prospectus, dated [______________], and the Prospectus Supplement to the Prospectus, [______________] (the "Prospectus Supplement"), relating to [______________] Certificates (the "Certificates") to be issued pursuant to a Pooling and Servicing Agreement, dated as of [______________] (the "P&S"), among the Depositor, as depositor, [______________], as servicer (the "Servicer"), and [______________], as trustee (the "Trustee");

WHEREAS, as an inducement to the Depositor to enter into the P&S, and [______________] (the "Underwriter[s]") to enter into the Underwriting Agreement, dated [______________] (the "Underwriting Agreement") between the Depositor and the Underwriter[s], and [______________] (the "Initial Purchaser[s]") to enter into the Certificate Purchase Agreement, dated [______________] (the "Certificate Purchase Agreement") between the Depositor and the Initial Purchaser[s], Seller has agreed to provide for indemnification and contribution on the terms and conditions hereinafter set forth;

WHEREAS, Morgan purchased from Seller certain of the Mortgage Loans underlying the Certificates (the "Mortgage Loans") pursuant to a Third Amended and Restated Mortgage Loan Purchase and Warranties Servicing Agreement, dated as of June 1, 2006 (the "Purchase Agreement"), by and between Morgan and Seller; and

WHEREAS, pursuant to Section 13 of the Purchase Agreement, the Seller has agreed to indemnify the Depositor, Morgan, the Underwriter[s], the Initial Purchaser[s] and their respective affiliates, present and former directors, officers, employees and agents.

NOW THEREFORE, in consideration of the agreements contained herein, and other valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Depositor, Morgan and the Seller agree as follows:

1. Indemnification and Contribution.

(a) The Seller agrees to indemnify and hold harmless the Depositor, Morgan, the Underwriter[s], the Initial Purchaser[s] and their respective affiliates and their respective

present and former directors, officers, employees and agents and each person, if any, who controls the Depositor, Morgan, the Underwriter[s] , the Initial Purchaser[s] or such affiliate within the meaning of either Section 15 of the Securities Act of 1933, as amended (the "1933 Act"), or Section 20 of the Securities Exchange Act of 1934, as amended (the "1934 Act"), against any and all losses, claims, damages or liabilities, joint or several, to which they or any of them may become subject under the 1933 Act, the 1934 Act or other federal or state statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based in whole or in part upon any untrue statement or alleged untrue statement of a material fact contained in the Prospectus Supplement, the Offering Circular, the ABS Informational and Computational Materials or in the Free Writing Prospectus or any omission or alleged omission to state in the Prospectus Supplement, the Offering Circular, the ABS Informational and Computational Materials or in the Free Writing Prospectus a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, or any such untrue statement or omission or alleged untrue statement or alleged omission made in any amendment of or supplement to the Prospectus Supplement, the Offering Circular, the ABS Informational and Computational Materials or the Free Writing Prospectus and agrees to reimburse the Depositor, Morgan, the Underwriter[s], the Initial Purchaser[s] or such affiliates and each such officer, director, employee, agent and controlling person promptly upon demand for any legal or other expenses reasonably incurred by any of them in connection with investigating or defending or preparing to defend against any such loss, claim, damage, liability or action as such expenses are incurred; provided, however, that Seller shall be liable in any such case only to the extent that any such loss, claim, damage, liability or action arises out of, or is based upon, (i) any breach of the representation and warranty set forth in Section 2(vii) below or (ii) any untrue statement or alleged untrue statement or omission or alleged omission made in reliance upon and in conformity with the Seller Information. The foregoing indemnity agreement is in addition to any liability which Seller may otherwise have to the Depositor, Morgan, the Underwriter[s], the Initial Purchaser[s] their affiliates or any such director, officer, employee, agent or controlling person of the Depositor, Morgan, the Underwriter[s], the Initial Purchaser[s] or their respective affiliates.

As used herein:

"Seller Information" means any information relating to Seller, the Mortgage Loans and/or the underwriting guidelines relating to the Mortgage Loans set forth in the Prospectus Supplement, the Offering Circular, the ABS Informational and Computational Materials or the Free Writing Prospectus and static pool information regarding mortgage loans originated or acquired by the Seller and included in the Prospectus Supplement, the Offering Circular, the ABS Informational and Computational Materials or the Free Writing Prospectus [incorporated by reference form the Seller's website located at __________] and in any case, provided by, or authorized in writing by the Seller for use in, the Prospectus Supplement, the Offering Circular, the ABS Informational and Computational Materials or the Free Writing Prospectus.

"Free Writing Prospectus" means any written communication that constitutes a "free writing prospectus," as defined in Rule 405 under the 1933 Act.

"ABS Informational and Computational Materials" means any written communication as defined in Item 1101(a) of Regulation AB under the 1933 Act and the 1934 Act, as may be amended from time to time.

"Due Diligence Writings" means the disclosure in the Free Writing Prospectus, Prospectus Supplement, Offering Circular or the ABS Informational and Computational Materials attached hereto as Exhibit A, and, to the extent such disclosure does not reflect the responses of the Seller to the questions asked by the Underwriter, which questions are based upon the requirements of Regulation AB, the written responses to such questions prepared by the Seller and attached hereto as Exhibit B.

"Offering Circular" means the offering circular, dated [__________] relating to the private offering of the [_______________] Certificates.

"Regulation AB": Subpart 229.1100 – Asset-Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (January 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

(b) Promptly after receipt by any indemnified party under this Section 1 of notice of any claim or the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against any indemnifying party under this Section 1, notify the indemnifying party in writing of the claim or the commencement of that action; *provided, however*, that the failure to notify an indemnifying party shall not relieve it from any liability which it may have under this Section 1 except to the extent it has been materially prejudiced by such failure; and *provided, further, however*, that the failure to notify any indemnifying party shall not relieve it from any liability which it may have to any indemnified party otherwise than under this Section 1.

If any such claim or action shall be brought against an indemnified party, and it shall notify the indemnifying party thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it wishes, jointly with any other similarly notified indemnifying party, to assume the defense thereof with counsel reasonably satisfactory to the indemnified party. After notice from the indemnifying party to the indemnified party of its election to assume the defense of such claim or action, except as provided in the following paragraph, the indemnifying party shall not be liable to the indemnified party under this Section 1 for any legal or other expenses subsequently incurred by the indemnified party in connection with the defense thereof other than reasonable costs of investigation.

Any indemnified party shall have the right to employ separate counsel in any such action and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such indemnified party unless: (i) the employment thereof has been specifically authorized by the indemnifying party in writing; (ii) such indemnified party shall have been advised by such counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the indemnifying party and in the

reasonable judgment of such counsel it is necessary or appropriate for such indemnified party to employ separate counsel; or (iii) the indemnifying party has failed to assume the defense of such action and employ counsel reasonably satisfactory to the indemnified party in a timely manner, in which case, if such indemnified party notifies the indemnifying party in writing that it elects to employ separate counsel at the expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such action on behalf of such indemnified party, it being understood, however, the indemnifying party shall not, in connection with any one such action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys (in addition to local counsel) at any time for all such indemnified parties.

Each indemnified party, as a condition of the indemnity agreements contained in this Section 1, shall cooperate with the indemnifying party in the defense of any such action or claim. No indemnifying party shall be liable for any settlement of any such action effected without its written consent (which consent shall not be unreasonably withheld), but if settled with its written consent or if there be a final judgment for the plaintiff in any such action, the indemnifying party agrees to indemnify and hold harmless any indemnified party from and against any loss or liability by reason of such settlement or judgment.

Notwithstanding the foregoing sentence, if at any time an indemnified party shall have requested an indemnifying party to reimburse the indemnified party for reasonable fees and expenses of counsel, the indemnifying party agrees that it shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than 45 days after receipt by such indemnifying party of the aforesaid request and (ii) such indemnifying party shall not have reimbursed the indemnified party in accordance with such request prior to the date of such settlement.

If the indemnification provided for in this Section 1 is unavailable to an indemnified party, then the indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities, in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, respectively, in connection with the statements or omissions that result in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative fault of the indemnified party and indemnifying party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such parties and their relative knowledge, access to information and opportunity to correct or prevent such statement or omission and any other equitable considerations.

The indemnity and contribution agreements contained in this Section 1 and the representations and warranties set forth in Section 2 shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by the Depositor, Morgan, the Underwriter[s], the Initial Purchaser[s] their respective affiliates, directors, officers, employees or agents or any person controlling the Depositor, Morgan, the

Underwriter[s], the Initial Purchaser[s] or any such affiliate, and (iii) acceptance of and payment for any of the Offered Certificates or the Private Certificates.

2. Representations and Warranties. Seller represents and warrants that:

(i) Seller is validly existing and in good standing under the laws of its jurisdiction of formation or incorporation, as applicable, and has full power and authority to own its assets and to transact the business in which it is currently engaged. Seller is duly qualified to do business and is in good standing in each jurisdiction in which the character of the business transacted by it or any properties owned or leased by it requires such qualification and in which the failure so to qualify would have a material adverse effect on the business, properties, assets or condition (financial or otherwise) of Seller;

(ii) Seller is not required to obtain the consent of any other person or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement;

(iii) the execution, delivery and performance of this Agreement by Seller will not violate any provision of any existing law or regulation or any order decree of any court applicable to Seller or any provision of the charter or bylaws of Seller, or constitute a material breach of any mortgage, indenture, contract or other agreement to which Seller is a party or by which it may be bound;

(iv) (a) no proceeding of or before any court, tribunal or governmental body is currently pending or, (b) to the knowledge of Seller, threatened against Seller or any of its properties or with respect to this Agreement or the Offered Certificates, in either case, which would have a material adverse effect on the business, properties, assets or condition (financial or otherwise) of Seller;

(v) Seller has full power and authority to make, execute, deliver and perform this Agreement and all of the transactions contemplated hereunder, and has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement. When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of each of Seller enforceable in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, by the availability of equitable remedies, and by limitations of public policy under applicable securities law as to rights of indemnity and contribution thereunder;

(vi) this Agreement has been duly executed and delivered by Seller; and

(vii) the Seller hereto represents that the Due Diligence Writings provided by the Seller are true, correct and complete in all material respects as of the date hereof.

3. Notices. All communications hereunder will be in writing and effective only on receipt, and, if sent to Seller, will be mailed, delivered or faxed or emailed and confirmed by mail [____________________]; if sent to Morgan, will be mailed, delivered or faxed or emailed and confirmed by mail to Morgan Stanley Mortgage Capital Inc., 1221 Broadway, New York, New York 10019, Attention: Peter Woroniecki – Whole Loans Operations Manager, Fax: [____], Email: peter.woroniecki@morganstanley.com, with copies to (i) Michelle Wilke, Morgan Stanley – Legal Counsel, Securities, Morgan Stanley, 1585 Broadway, 38th Floor, New York, New York 10036, Fax [_____], Email: michelle.wilke@morganstanley.com, and (ii) Steven Shapiro, Morgan Stanley – SPG Finance, Morgan Stanley, 1585 Broadway, 10th Floor, New York, New York 10036, Fax [_____], Email: steven.shapiro@morganstanley.com; if to the Depositor, will be mailed, delivered or telegraphed and confirmed to [____________________]; or if to the Underwriter[s], will be mailed, delivered or telegraphed and confirmed to [____________________]; or if to the Initial Purchaser[s], will be mailed, delivered or telegraphed and confirmed to [____________________].

4. Miscellaneous. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to the conflict of laws provisions thereof. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns and the controlling persons referred to herein, and no other person shall have any right or obligation hereunder. Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought. This Agreement may be executed in counterparts, each of which when so executed and delivered shall be considered an original, and all such counterparts shall constitute one and the same instrument. Capitalized terms used but not defined herein shall have the meanings provided in the Purchase Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers hereunto duly authorized, this __th day of [______________].

[DEPOSITOR]

By:________________________________
Name:
Title:

MORGAN STANLEY MORTGAGE CAPITAL INC.

By:________________________________
Name:
Title:

[SELLER]

By:________________________________
Name:
Title:

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Fernando M. Olguin.

The case number on all documents filed with the Court should read as follows:

**8:CV08- 1469 DOC (FMOx)**

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
**312 N. Spring St., Rm. G-8**
**Los Angeles, CA 90012**

[X] **Southern Division**
**411 West Fourth St., Rm. 1-053**
**Santa Ana, CA 92701-4516**

[ ] **Eastern Division**
**3470 Twelfth St., Rm. 134**
**Riverside, CA 92501**

Failure to file at the proper location will result in your documents being returned to you.

COPY

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Public Employees' Retirement System of Mississippi, Individually and On Behalf of All Others Similarly Situated

**DEFENDANTS**
Morgan Stanley, et al.

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Bernstein Litowitz Berger & Grossmann LLP
12481 High Bluff Drive, Suite 300
San Diego, California 92130 Tel: (858) 793-0070

**Attorneys** (If Known)
Christopher B. Hockett
Davis Polk & Wardwell
1600 El Camino Real
Menlo Park, California 94025 Tel: (650) 752-2000
Attorneys for Morgan Stanley Defendants

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding ☑ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No ☐ **MONEY DEMANDED IN COMPLAINT: $**______

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Plaintiff filed claim pursuant to Securities Act of 1933; Defendants remove pursuant to 28 U.S.C. § 1452

**VII. NATURE OF SUIT** (Place an X in one box only.)

BY FAX

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☑ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Act
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Info. Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**
PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Fed. Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury-Med Malpractice
☐ 365 Personal Injury-Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus-Alien Detainee
☐ 465 Other Immigration Actions

**TORTS**
PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 445 American with Disabilities - Employment
☐ 446 American with Disabilities - Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus/ Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/ PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety /Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS-Third Party 26 USC 7609

FOR OFFICE USE ONLY: Case Number: SACV08-01469 DOC (FMOx)

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): ______

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): ______

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)
☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Mississippi |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Delaware, New York |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | New York |

*** Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): [signature] Date 12/30/08

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |